## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

**In re:**

**TERRANCE J. MCCLINCH,**

        **Debtor.**

_____/

          **Chapter 11**
          **Case No. 18-10568**
          **Judge Michael A. Fagone**


### MOTION BY CREDITOR THE ARTHUR L. MCCLINCH TRUST DATED APRIL 3, 1981 FOR CONVERSION TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112 WITH INCORPORATED MEMORANDUM OF LAW


Dated: April 2, 2021


**SCHOEPPL LAW, P.A.**
*Co-Counsel for Creditor*
*THE ARTHUR L. MCCLINCH*
*TRUST DATED APRIL 3, 1981*
4651 North Federal Highway
Boca Raton, Florida 33431
Telephone: (561) 394-8301
Email: carl@schoeppllaw.com

**LAW OFFICE OF JAY S. GELLER**
*Counsel for Creditor*
*THE ARTHUR L. MCCLINCH*
*TRUST DATED APRIL 3, 1981*
Lunt Professional Building
74 Lunt Road, Suite 206
Falmouth, Maine 04105
Telephone: (207) 899-1477
Email: jgeller@jaysgellerlaw.com

## TABLE OF CONTENTS

                                                                                    Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.       SUMMARY OF MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.      STATEMENT OF RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

         A.      McClinch's $2.9 Million Debt Owed to the ALM Trust . . . . . . . . . . . . . . . . . . 2

         B.      McClinch's Sale of the Thorpe Street Property . . . . . . . . . . . . . . . . . . . . . . . . 5

         C.      Beginning with His Petition, McClinch Has Repeatedly
                 Made False Statements Under Oath and Failed to Make
                 Required Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

         D.      McClinch's Plan of Reorganization Mandates that His
                 Bankruptcy Estate Continues to Exist Post-Confirmation . . . . . . . . . . . . . . . 11

         E.      McClinch Has Not Complied with the Terms of the Plan
                 and Has Repeatedly Failed to Timely File Required Reports . . . . . . . . . . . . 12

         F.      McClinch's Dissipation of Thorpe Street Proceeds and Failure
                 to Use those Proceeds to Fund Plan Obligations . . . . . . . . . . . . . . . . . . . . . . . 14

III.     MEMORANDUM OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         A.      Standards for Conversion to Chapter 7 Pursuant
                 to 11 U.S.C. § 1112(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         B.      There is Overwhelming Cause for Conversion
                 to Chapter 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

         C.      Conversion to Chapter 7 Is in the "Best Interests" of
                 Creditors and the Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CERTIFICATION OF PRE-FILING CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b) . . . . . . . . . . . . . . . . . . . . . . 25

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>                                                                                              <u>**Page**</u>

*In re Andover Covered Bridge, LLC*,
    553 B.R. 162 (B.A.P. 1st Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Aurora Memory Care, LLC*,
    589 B.R. 631 (Bankr. N.D. Ill. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 21-22

*In re Capra*,
    614 B.R. 291 (Bankr. N.D. Ill. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21, 23

*In re Colón Martinez*,
    472 B.R. 137 (B.A.P. 1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Del Monico*,
    No. 04 B 28235, 2005 WL 1129774 (Bankr. N.D. Ill. May 13, 2005) . . . . . . . . . . . . . . 21

*Doustout v. G.D. Searle & Co.*,
    684 F. Supp. 16 (D. Me. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re El Comandante Mgmt. Co., LLC*,
    359 B.R. 410 (Bankr. D.P.R. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*\*In re Francis*,
    No. BAP MB 18-012, 2019 WL 1265316
    (B.A.P. 1st Cir. Mar. 14, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17,18, 21, 22

*In re Hoover*,
    828 F.3d 5 (1st Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

*In re L&R Development & Investment Corp.*,
    BAP No. PR 19-044, 2020 WL 1862377
    (B.A.P. 1st Cir. Apr. 13, 2020) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Mailman Steam Carpet Cleaning Corp.*,
    196 F.3d 1 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Sapphire Development LLC*,
    523 B.R. 1 (D. Conn. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Wiley*,
    579 B.R. 1 (Bankr. D. Me. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Statutes, Rules and Regulations**

D.Me. LBR 2015-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

11 U.S.C. § 105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11 U.S.C. § 1109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11 U.S.C. § 1112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

11 U.S.C. § 1115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

11 U.S.C. § 1141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Bankr. P. 2015.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Other Authorities**

Operating Guidelines and Reporting Requirements
    for Chapter 11 Cases, Region 1 (eff. 1/1/20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7 Lawrence P. King, *Collier on Bankruptcy*,
    ¶ 1109.02[1] (15th Rev. Ed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Pursuant to 11 U.S.C. § 1112(b)(1), Creditor The Arthur L. McClinch Trust Dated April 3, 1981 (the "ALM Trust"), authorized by its Trustee Joseph A. Palsa ("Palsa") and represented by its undersigned counsel, respectfully requests that the Court convert this Chapter 11 case to Chapter 7 and states as follows:

## I.   SUMMARY OF MOTION

Substantial cause exists to convert the Debtor's Chapter 11 case to Chapter 7.  The Debtor, Terrance J. McClinch ("McClinch" or the "Debtor"), acknowledges that he has materially defaulted and failed to comply with the terms of his confirmed Plan.[1] Despite receiving nearly $600,000 cash in March 2020 from the sale of 185 Thorpe Street — proceeds that he affirmatively represented to the Court would be used to fund the Plan — he has quickly dissipated those funds and failed to pay creditors. His failure to comply with the terms of the Plan even when he received funds enabling him to do so and his rapid dissipation of those funds to support an extravagant lifestyle demonstrates both gross mismanagement as well as the substantial and continuing diminution of the estate. McClinch also has failed to file certain required reports entirely and has failed to file others timely.

Conversion to Chapter 7 is in the best interests of both the creditors and the estate because:

(a) McClinch is due to receive an additional $2.6 million from the sale of 185 Thorpe Street so there

---

[1] *See* Monthly Post-Confirmation Summary Reports for the months of April 2020 through January 2021, at 2 ¶ 2, ECF Nos. 188 through 197 (checking box for "no" in response to "Have plan payments been timely disbursed as required by the Plan?").  Rather than attaching those Reports and other court filings referenced herein, judicial notice of the date, fact and content of such filings is appropriate and the Movant requests that the Court take such notice.  *See, e.g., In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 8 (1st Cir. 1999) (noting that "bankruptcy court appropriately took judicial notice of its own docket . . .") (citing to Fed.R.Evid. 201); *Doustout v. G.D. Searle & Co.*, 684 F. Supp. 16, 17 & n.1 (D. Me. 1988) ("The Court is entitled to take judicial notice of all related proceedings and records in cases before the same court."); *In re Wiley*, 579 B.R. 1, 3 (Bankr. D. Me. 2017) (Court took judicial notice of its own docket).  As the Court is aware, the ALM Trust and Trustee Palsa have filed a related adversary proceeding, *Palsa v. McClinch*, Adv. Proc. No. 20-01004 (Bankr. D. Me.) (the "Adversary Case"), that remains pending before the Court. Citations to ECF filings in the Adversary Case will be preceded by "Adv." Any pinpoint citations to ECF filings will be to the ECF electronic page number at the top of the page.

1

are assets available to repay creditors and there are likely also preferential and fraudulent transfers that can be recovered for the benefit of the estate and creditors by a Chapter 7 trustee; and (b) McClinch has demonstrated that he will dissipate any funds received from the Thorpe Street Property sale, so it is evident that conversion to Chapter 7 and the appointment of a trustee is the only avenue that will provide any recovery for creditors.

## II.     STATEMENT OF RELEVANT FACTS

### A.     McClinch's $2.9 Million Debt Owed to the ALM Trust

In 2009, McClinch was a Co-Trustee of both the ALM Trust and a second trust referred to as the "Fund A Trust."[2]  McClinch also was (and continues to be) the sole owner of 185 Thorpe Street Corporation ("185 Thorpe Street Corp."), a real estate holding company, with its sole asset being real property located at 185 Thorpe Street, Fairfield, Connecticut (the "Thorpe Street Property").

On or about July 31, 2009, McClinch caused 185 Thorpe Street Corp. to borrow $1 million from the Fund A Trust and $1.5 million from the ALM Trust.[3] As security for the loans, 185 Thorpe Street Corp. and McClinch provided the two trusts with a mortgage on the Thorpe Street Property.[4] The loan documents further provided that 185 Thorpe Street Corp. and McClinch, as co-obligors, would pay interest on the loans at 8% per year payable in arrears annually beginning on June 1, 2010,

---

[2] Complaint, Adv. ECF No. 1, at ¶ 20; Defendant's Answer, Affirmative Defenses, and Counterclaims ("Answer"), Adv. ECF No. 45, at ¶ 20 ("Admitted.").

[3] *See* 185 Thorpe Street Loan Documents dated July 31, 2009, copies of which are attached to the Complaint, Adv. ECF No. 1, as Composite Exhibit 3.

[4] *Id.*, Composite Exhibit 3 at 1-17.

2

with the principal and any accrued interest due in a balloon payment on or before June 1, 2014.[5]

McClinch immediately defaulted on his obligation to pay interest on the loans.[6]  In or about May 2012, his mother, Virginia McClinch, sent him a notice of default and requested payment of the back interest.[7]  McClinch responded that, due to economic conditions at the time and the significant cash needs of his various businesses, bringing the interest payments current was not possible and he did not expect the situation to improve in the foreseeable future. While still a Trustee of both Trusts, McClinch requested that the loans be restructured because he felt that the 8% interest rate was too high.  He also requested that the Trusts release the mortgage on the Thorpe Street Property and accept in its place a $5 million life insurance policy on his life on which he would pay the premiums.[8]

After several months, McClinch persuaded his mother and sisters to consent to the restructuring.[9]  On December 11, 2012, McClinch's counsel (representing him in his capacity as Trustee of the two Trusts) requested that McClinch's four sisters (the other beneficiaries of the two

---

[5] *Id*., Composite Exhibit 3 at 18-24 (Fund A Note) and 24-29 (ALM Trust Note). *See also* Complaint, Adv. ECF No. 1, at ¶ 21.  Answer, Adv. ECF No. 45, at ¶ 21 (admitting allegations set forth above).

[6] Complaint, Adv. ECF No. 1, at ¶ 23; Answer, Adv. ECF No. 45, at ¶ 23 ("Denied.").

[7] Complaint, Adv. ECF No. 1, at ¶ 23; Answer, Adv. ECF No. 45, at ¶ 23 ("Denied.").

[8] Complaint, Adv. ECF No. 1, at ¶ 25; Answer, Adv. ECF No. 45, at ¶ 25 ("Denied, except to admit that the Defendant requested that the Thorpe Street Property Mortgage be released.").  McClinch's conduct and misrepresentations in connection with the proposed restructuring of his debt — which occurred while he was sole Trustee of the ALM Trust and co-Trustee of the Fund A Trust — are the basis of the ALM Trust's breach of fiduciary duty claim in Count III of the Complaint and, in conjunction with other misrepresentations McClinch made in connection with the restructuring, of the fraud claim in Count IV.  The ALM Trust also seeks to revoke the Order confirming the Plan (Count I) and asserts a claim against McClinch for breach of the loan contracts (Count II).

[9] The Complaint alleges that McClinch made numerous material misrepresentations and omissions in order to persuade his mother and sisters to agree to the restructuring and release the Thorpe Street Property. *See, e.g.*, Complaint, ECF 1, at ¶¶ 67, 68. Included in these misrepresentations and omissions were knowingly false statements by McClinch that he would make the Trusts whole and that he intended to pay for a $5 million life insurance policy as alternate collateral to secure the loans. *Id.*

3

trusts) consent to the restructuring of McClinch's debt prior to McClinch's resignation as Trustee.

After McClinch had resigned as Trustee of both Trusts and Palsa had formally replaced him, the Restructuring Agreements were executed.[10] The Restructuring Agreements greatly benefitted McClinch to the detriment of the two Trusts by, among other things: (a) releasing the mortgage on the Thorpe Street Property and removing 185 Thorpe Street Corp. as co-obligor; and (b) providing that, as substitute collateral for the mortgage on the Thorpe Street Property, McClinch would (i) purchase a $5 million life insurance policy, with McClinch to pay the premiums as they came due, and (ii) providing a mortgage on a far less valuable property (referred to as the "Candlelight Airport Property") as security for the payment of the premiums.[11]

Immediately after the restructuring documents were executed, McClinch defaulted and failed to pay the premiums on the life insurance policy.[12]   The Fund A Trust paid several premiums as protective advances but, ultimately, the policy was surrendered in order to recover the premiums paid by the Fund A Trust.  As a result, the loans to McClinch were left entirely unsecured.

In 2017, the Connecticut Probate Court approved the final accounting for the Fund A Trust and its assets were distributed to McClinch's four sisters, with McClinch receiving, as his share, a

---

[10] The Restructuring Agreements were executed on January 15, 2014, but made effective as of May 1, 2013.  Although Trustee Palsa executed the Restructuring Agreements on behalf of the two Trusts, he did so only because McClinch had obtained the Consents of his mother and sisters, the other beneficiaries of the Trusts. Without their written consents, Palsa would have submitted the restructuring transaction to the Probate Court for approval.

[11] The Restructuring Agreements for both the Fund A Trust and the ALM Trust loans are attached to the Complaint, Adv. ECF No. 1, as Composite Exhibit 4.  The Complaint also contains a detailed analysis demonstrating how the terms of the restructuring favored McClinch to the detriment of the two Trusts.  Complaint, Adv. ECF No. 1, at ¶ 27.

[12] At the time, McClinch was in his mid-60's and as might be anticipated, the premiums for a $5 million life insurance policy were substantial.  The Candlelight Airport Property turned out to be far less valuable than McClinch had represented so foreclosure on that Property would have funded the insurance policy for only a short time.

forgiveness of most of the loan from the Fund A Trust.[13]   McClinch has not repaid any of the loan from the ALM Trust and, with the accrued interest, he now owes the ALM Trust nearly $3 million, plus attorneys' fees and costs.

### B.    McClinch's Sale of the Thorpe Street Property

On October 8, 2014, 185 Thorpe Street Corp./McClinch, as seller, entered into an agreement (the "Original Agreement") to sell the Thorpe Street Property to Scinto Thorpe, LLC ("Scinto Thorpe"). The Original Agreement was subsequently amended numerous times to account for loans to 185 Thorpe Street Corp./McClinch by Scinto Thorpe, for clean up costs incurred by Scinto Thorpe, and for changes in regulatory approvals. In essence, McClinch and Scinto engaged in an informal joint venture to improve the Thorpe Street Property — with McClinch providing the land and Scinto providing the remediation and improvements necessary to get zoning approval to build — and then intended to sell it either to Scinto or to a third party.[14]

On September 25, 2018 — two days before McClinch filed his bankruptcy petition — 185 Thorpe Street Corp./McClinch actually transferred title to the Thorpe Street Property to Scinto Thorpe.[15]  On that same date, the parties executed the Fifth Amendment to Purchase and Sale Agreement (the "Fifth Amendment") which provided, among other things, that 185 Thorpe Street

---

[13] The ALM Trust purchased the remainder of McClinch's loan, amounting to $61,755.67, so the Fund A Trust could be terminated. Complaint, Adv. ECF No. 1, at ¶ 30.

[14] *See* 341 Transcript, attached hereto as **Exhibit A**, at 11:15-14:9 (discussion of arrangement between McClinch and Scinto for development of Thorpe Street Property).

[15]*See* Warranty Deed recorded on September 27, 2018, a copy of which is attached to the Complaint, Adv. ECF No. 1, as Exhibit 5. *See also* Complaint, Adv. ECF No. 1, ¶¶ 31, 33; Answer, Adv. ECF No. 45, ¶ 31 ("Defendant admits the allegation that 185 Thorpe Street Corp. sold the Thorpe Street Property to Scinto Thorpe on or around September 25, 2018. The remaining allegations in Paragraph 31 are denied."); ¶ 33 (admitting that "the transaction on September 25, 2018, is the only time that they [McClinch and Scinto] have actually filed documents necessary to transfer title to the Thorpe Street Property from an entity controlled by Terry to an entity controlled by Scinto").

Corp. would receive an advance against the purchase price in the form of a $200,000 loan.[16]  In the Fifth Amendment, the parties also agreed on two different scenarios to establish the price for the Thorpe Street Property:[17] $5,000,000 if it was sold as undeveloped land, or $7,750,000 if approved for use as an assisted or independent living facility.[18]

On September 27, 2018, two days after transferring title to the Thorpe Street Property to Scinto Thorpe, McClinch filed his voluntary Chapter 11 Petition (the "Petition").  ECF No. 1. Although McClinch avoided disclosing any value for his 100% ownership of 185 Thorpe Street Corp. in his schedules by stating that the value was "unknown," his proposed Plan of Reorganization, confirmed by the Court on October 11, 2019 (the "Plan"), stated that the Plan would be funded, at least in part, by "cash generated by the potential sale of the Thorpe Street Project . . ."[19]

In February 2020, after a favorable zoning ruling, McClinch and Scinto agreed on the final terms of the sale.  *See* Sixth Amendment to Purchase and Sale Agreement and Release (the "Sixth Amendment"), attached as **Exhibit B** hereto.[20]  The purchase price was set at $7,750,000 and, after

---

[16]*See* Fifth Amendment, attached as exhibit to Defendant's Motion to Dismiss, Adv. ECF No. 21-1, Exhibit D at 1-2 (providing that purchaser's affiliate, R.D. Scinto, Inc., would loan $200,000 to 185 Thorpe Street Corp. within three days of closing).

[17]Fifth Amendment, attached as Adv. ECF No. 21-1, Exhibit D at 3-4, ¶ 2.

[18] There were substantial transaction costs — including, among others, repayment of loans made to 185 Thorpe Street Corp., conveyance taxes, fines for existing blight liens, and title search/insurance charges — that would reduce the net amount to be paid to 185 Thorpe Street Corp. *See* Fifth Amendment, Adv. ECF No. 21-1, Exhibit D at 4-5, ¶ 3.  But there is no indication that the transaction costs would ever result in zero net proceeds to 185 Thorpe Street Corp.

[19] ECF No. 144, at 10, § 5.1.

[20] Exhibit A to the Sixth Amendment contains a breakdown showing how the amount due to McClinch — $3,273,832 — was calculated.  McClinch received a payment of $600,000 in March 2020 and an Amended and Restated Promissory Note (the "Note"), attached as **Exhibit C** hereto, for the difference, $2,673,832.  The Note provides that McClinch will receive payment when Scinto receives the construction financing for the 185 Thorpe Street Project and replaces an earlier Promissory Note for $2,600,000 executed on September 27, 2018. Both the Sixth Amendment and the Note were produced pursuant to subpoena by Goldman Gruder & Woods, LLC, McClinch's real estate counsel, and have been certified as business records.  *See* **Exhibit D** hereto.

Document    Page 11 of 30

all seller expenses, remediation costs incurred by Scinto, repayment of loans and interest and application of an agreed upon formula, the net amount payable to 185 Thorpe Street Corp./McClinch was determined to be $3,273,832. *Id.* McClinch requested a $600,000 advance, which was paid to his real estate counsel, Goldman Gruder & Woods, LLC, and then deposited into McClinch's Chase account on March 17, 2020.[21] The remaining proceeds of the sale — $2,673,832 — is expected to be paid to 185 Thorpe Street Corp./McClinch later in 2021 when and if Scinto Thorpe obtains construction financing for the project.

### C.    Beginning with His Petition, McClinch Has Repeatedly Made False Statements Under Oath and Failed to Make Required Disclosures

McClinch has repeatedly demonstrated a lack of good faith in his dealings with both his creditors and this Court. McClinch's bankruptcy filings — many of which were submitted under penalty of perjury — are replete with inconsistencies, untruths, omissions, and misrepresentations that conceal his true financial condition and demonstrate that his abuse of the bankruptcy process.

When McClinch filed the Petition on September 27, 2018, he estimated, under penalty of perjury, that his assets were worth "$10,000,001 - $50,000,000." ECF No. 1, at 6, ¶ 19. In his initial Schedules of Assets and Liabilities filed on October 16, 2018, McClinch valued his total assets, comprised of both real and personal property, at $2,544,859.41. ECF No. 22, at 2. Subsequently, that figure was amended to state that the value of all of his assets (including those for which he stated the value was "unknown") was $2,548,640.63. ECF No. 42 at 2.

In his Schedules of Assets and Liabilities, McClinch identified eight entities owned 100% by him, including 185 Thorpe Street Corp. As to each entity's value, McClinch stated "unknown"

---

[21] ECF No. 175, at 3. After deducting certain fees, the actual amount transferred was $587,389.00. *Id.*

and assigned *no value* to *any* of those entities for purposes of calculating his total assets.[22] In addition, McClinch stated that he had a safety deposit box at Chase, but that its contents and value were also "unknown."[23]

Most significant and injurious to the ALM Trust, McClinch failed to list the ALM Trust, his largest unsecured creditor, as a creditor. This failure deprived the ALM Trust of notice of his bankruptcy case as well as an opportunity to file a claim, object to the Plan, or otherwise protect its interests.[24]

Rule 2015.3 of the Federal Rules of Bankruptcy Procedure — "Reports of Financial Information on Entities in Which a Chapter 11 Estate Holds a Controlling or Substantial Interest" — requires a Chapter 11 debtor to file an Official Form 426 "no later than seven days before the first date set for the meeting of creditors under § 341 of the Code," with subsequent reports to "be filed no less frequently than every six months thereafter, until the effective date of a plan or the case is dismissed or converted." Official Form 426, entitled "Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest," requires the Debtor to provide detailed information critical to his creditors relating to "the value, operations, and profitability of each Controlled Non-Debtor Entity." Official Form 426 requires a substantial amount of information about each entity controlled by a debtor, including, *inter alia*, a balance sheet, statement of income (loss), statement of cash flows, and business operations.

---

[22] ECF No. 22, at 7-8. *See also* Amended Schedules of Assets and Liabilities, ECF No. 42 at 5-6 (again listing eight entities owned 100% by McClinch, including 185 Thorpe Street Corp., and listing current value as "unknown").

[23] ECF No. 22, at 44-45. *See also* Amended Schedules of Assets and Liabilities, ECF No. 42, at 34 (again stating that contents of safe deposit box at Chase Bank were "unknown").

[24] Complaint, Adv. ECF No.1, at ¶¶ 36-43.

8

The docket does not indicate that McClinch ever filed an Official Form 426 or complied with Rule 2015.3. Given his valuation of "unknown" for each of the eight entities he identified as 100% owned by him, his failure to provide the information contained in Official Form 426 was highly material to any assessment of whether a Plan was feasible and in the best interests of creditors.

McClinch's creditor's meeting was rescheduled twice, but finally took place on December 4, 2018.[25] At the creditor's meeting, the U.S. Trustee questioned McClinch about his 100% owned entities and his bank accounts. McClinch stated, among other things, that an account at Stockman Bank, which contained $35,000 when he filed the Petition, now contained only $5,000 and explained the reduction by saying "a lot of it is transferred to ranch expenses and I would say I've had to rent a place down here . . ." 341 Transcript, attached as **Exhibit A**, at 8:11-13.[26] When the U.S. Trustee told McClinch "[t]hat shouldn't be happening," *id.*, at 10:9-12, — meaning that McClinch should not be spending his personal funds for ranch expenses — counsel for McClinch explained:

> 13 No, that's been made clear.
> 14 We'll take a look at that because that's been
> 15 discussed, as you might imagine, on many occasions.
> 16 And there are mechanisms for funding the ranch
> 17 expenses and for funding the airport expenses, which
> 18 is the Thorp Street relationship, which we spent a
> 19 lot of time with Judge Figoni [phonetic] on at the
> 20 last hearing. So, I don't know if you want to get
> 21 into this now, or later, or not at all, but there
> 22 are mechanisms by which the expenses of the Chapter
> 23 11's of the two businesses will be funded with

---

[25]McClinch's 341 meeting was combined with that for Candlelight and Circle 9, two other entities owned and controlled by McClinch that each filed for bankruptcy shortly after McClinch did. *See In re Candlelight Farms Airport, LLC*, Case No. 18-10579 (Bankr. D.Me.), and *In re Circle 9 Cattle Company, LLC*, Case No. 18-10569 (Bankr. D.Me.). Both entities subsequently sold their assets, used the funds to retire secured debt, and dismissed their bankruptcy cases.

[26]Counsel for the ALM Trust had the audio tape of the December 4, 2018 341 meeting professionally transcribed by Veritext Legal Solutions Company which has attached, as the last page of the transcript, a certificate authenticating the transcript as a "true, correct and complete transcript . . ."

> 24 proceeds from Thorp Street, which is not a debtor,
> 25 which is an entity that sits outside of the
> 1 bankruptcies.

341 Transcript, attached as **Exhibit A** hereto, at 9:13-10:1.

At the 341 meeting, McClinch's counsel assured the U.S. Trustee that McClinch had a number of properties for sale, could likely repay his personal creditors even without Thorpe Street, and "[i]f the Thorp Street deal comes to fruition, that clears the decks and then some." *Id.*, at 38:4-24. McClinch stated that he expected Scinto would write him a check in the "ballpark" of "$5 to 7 million." *Id.*, at 51:19. But after McClinch indicated that his only income was his Social Security benefit — and his counsel indicated he needed that money to buy groceries — the U.S. Trustee advised McClinch that he could well be headed for Chapter 7 because it could be "more fair to creditors if an independent entity, like a Chapter 7 trustee, was in charge of the liquidation of your estate." *Id.*, at 60:23-61:14; 62:21-64:3.

The U.S. Trustee also advised McClinch on the importance of filing timely monthly reports and his responsibility to manage his estate so that his creditors would not be harmed. *Id.*, at 56:22-57:3 ("Mr. McClinch, the price of being in Chapter 11 includes the requirement that you file on a timely basis a statement of your monthly income and all your expenses, it includes the basic responsibility to manage your estate, at the very minimum so that creditors are not harmed by the duration of the Chapter 11 case . . .").

The U.S. Trustee also warned McClinch that he was "short of the mark" in being able to "account for every penny that's earned and spent" and that there is only "a certain amount of patience we can employ . . . we have a window that is narrowing on the extent to which we can exercise our discretion and hold back from requesting that a Chapter 7 trustee be appointed." *Id.*, at 62:21-64:2.

10

Despite the admonition by the U.S. Trustee, McClinch has not filed monthly reports on a timely basis.[27]  The Docket Sheet reflects that he has rarely filed any report even within thirty days of months' end and often files reports in batches many months late. [28]

### D.    McClinch's Plan of Reorganization Mandates that His Bankruptcy Estate Continues to Exist Post-Confirmation

Although the Plan parrots the language of 11 U.S.C. § 1141(b) by reciting that "[u]pon entry of the Confirmation Order, all property of the Debtor's estate shall vest in the Debtor, free and clear of all liens, claims and encumbrances, *except to the extent otherwise provided in the Plan*," ECF No. 144, at 15, § 8.18 (italics added), the Plan does expressly provide otherwise.  Section 2.21 of the Plan explicitly defines "Estate" as "the bankruptcy estate of the Debtor, created in the Chapter 11 Case pursuant to § 541 of the Bankruptcy Code, *which shall include the continuation of the Estate after confirmation of the Plan.*"  ECF No. 144, at 6, § 2.21 (italics added).  Section 8.12 of the Plan provides for the automatic stay to "remain in full force and effect until the close of the Chapter 11 Case,"[29] thereby providing the bankruptcy estate with the continued protection afforded by the stay.  ECF No. 144, at 13-14, § 8.12.[30]  Section 8.16 mandates that the Bankruptcy Court retain broad

---

[27] As will be discussed below, a single late filing demonstrates "cause" for conversion or dismissal and McClinch has repeatedly filed reports *months* late. MORs are due fourteen (14) days after the end of each month.  *See* Operating Guidelines and Reporting Requirements for Chapter 11 Cases, Region 1 (eff. 1/1/20), at 9, 15.

[28] McClinch filed Debtor-in-Possession Monthly Operating Reports ("MORs") for the months of September and October 2018 on February 15, 2019.  ECF Nos. 91, 92.  He filed MORs for the months of November 2018 through February 2019 on April 3, 2019.  ECF Nos. 96, 97, 98, 99.  He filed the March 2019 MOR on May 22, 2019, and the April 2019 MOR on June 12, 2019.  ECF Nos. 108, 115. He file the June 2019 MOR on July 18, 2019, but did not file the May 2019 MOR until August 6, 2019.  ECF Nos. 125, 129.  He filed the MORs for July and August 2019 on August 20, 2019, and September 16, 2019, respectively.  ECF Nos. 137, 138.

[29] Section 8.15 provides that McClinch's Chapter 11 Case "shall be deemed closed at such time as the Order closing the case pursuant to Bankruptcy Code § 350 has been entered by the Bankruptcy Court on the motion of the Debtor, and the Order becomes a Final Order."  *Id.*, at 14, § 8.15.

[30] McClinch has indicated an intent to seek a Final Decree on June 30, 2021. *See, e.g.*, ECF No. 197, at 2.

11

jurisdiction post-confirmation. *Id.* at 14-15, § 8.16. And finally, the Plan contemplates the future

conversion of the Chapter 11 Case to Chapter 7. *Id.* at 16, § 8.21.

### E.    McClinch Has Not Complied with the Terms of the Plan and Has Repeatedly Failed to Timely File Required Reports

The Plan states that it will be funded as follows:

> The Debtor shall primarily fund his obligations under the Plan from the following sources: (a) cash on hand of the Debtor; (b) the potential sale of the Congress Street Property; and/or (c) cash generated by the potential sale of the Thorpe Street Project and/or the sale of the property owned by Candlelight . . .

ECF No. 144, at 10, § 5.1. After the sale of the real property owned by Candlelight and the

repayment of its secured creditors, there was very little remaining to fund McClinch's obligations

under the Plan. The "Congress Street Property" is a residential property that McClinch owns with

his wife. Unless it is sold, the primary source of funding for the Plan is the Thorpe Street Property.

The Court confirmed the Plan on October 11, 2019. ECF No. 144. Subsequently, McClinch

filed "Monthly Post Confirmation Summary Reports" ("PC Reports") but, again, those reports were

rarely, if ever, filed timely. *See, e.g.*, ECF Nos. 152, 159, 164, 173, 174, 175 (PC Reports for the

months of October, November and December 2019 and January, February, March 2020).[31]

Until the February 2020 PC Report, McClinch had answered "yes" in the reports as to

whether plan payments had been timely disbursed as required by the Plan. *See, e.g.*, ECF No. 173

(January 2020 PC Report). In the February 2020 Report, he checked "no" and indicated that "the

---

[31] D.Me. LBR 2015-1 requires a Chapter 11 debtor to file "monthly operating reports" — not just the PC Reports used to calculate U.S. Trustee fees — "until the earlier of (a) the entry of a final decree in the Chapter 11 case or (b) the conversion or dismissal of the case pursuant to 11 U.S.C. § 1112." McClinch stopped filing monthly operating reports after his Plan was confirmed and, until filing the PC Report for December 2020, ECF No. 196, on March 4, 2021, did not include any detail as to how he was spending funds he received.

first quarterly distribution to unsecured creditors was due on 1/1/20 and has not been made yet."
ECF No. 174 at 2.

In the March 2020 PC Report filed on April 20, 2020, ECF No. 175, McClinch disclosed that he had received $587,767.07 from Goldman Gruder and Woods, LLC, on March 17, 2020.   ECF No. 175, at 3.[32]   McClinch also disclosed that, in addition to using those funds for his living expenses, he had made five large transfers totaling $138,000 during March[33] and he again stated that payments due under the Plan had not been timely disbursed.  ECF No. 175, at 2.  He explained the circumstances as follows:

> Bank of America, who holds Class One Claim, has not provided the balance of the loan and the payments due, therefore the payments commencing on December 1, 2019 were not made. The first quarterly distribution to unsecured creditors was due on 1/1/2020 and has not been made yet.

*Id.*  The first sentence was untrue because two weeks *before* he filed the March Report, on April 6, 2020,  McClinch was advised by the MEB Loan Trust (transferee of Bank of America's secured claim) that (a) he was in default, (b) the current unpaid principal balance on the loan was $1,160,709.29, (c) the monthly payments were $7,336.47, and (d) the total due for the payments from December 1, 2019 to April 1, 2020 was $36,682.  ECF No. 177-4, Ex. B.

After belatedly filing the March 2020 PC Report, McClinch stopped filing any reports at all until the end of the year.

---

[32] Discovery later revealed that those funds were paid to McClinch as part of the proceeds from the sale of the Thorpe Street Property. *See* Sixth Amendment, attached as **Exhibit B**.  As discussed above, McClinch is due to receive an additional $2,673,832 as payment for the Thorpe Street Property.  *See* Note, attached as **Exhibit C** hereto.

[33] McClinch made a transfer of $65,000 to his counsel for "Legal Fees"; two transfers to Cross Land and Cattle, LLC of $25,000 and $20,000, each described as "personal charge"; and two transfers to account *2199 of $10,000 and $18,000. ECF No. 175, at 3-4.

**F.    McClinch's Dissipation of Thorpe Street Proceeds and Failure to
Use Those Proceeds to Fund Plan Obligations**

On December 30, 2020, McClinch filed eight months of PC Reports covering the period from
April through November 2020.  ECF Nos. 188-195.  All of these PC Reports state that the Debtor
is not complying with the terms of the Plan, has not paid any of his creditors, and "has not been able
to fund certain post-petition debt in the ordinary course."  None provide details of how McClinch
was spending the Thorpe Street proceeds that he received in March 2020.  The November 2020 PC
Report states that the Debtor's end of month cash balance was $162,740, demonstrating that by the
end of November 2020, McClinch had spent over $420,000 of the cash he had received in March
2020 and that none of those monies had been used to fund the Plan.

On March 4, 2021, McClinch filed PC Reports for December 2020 [ECF No. 196] and
January 2021 [ECF No. 197], with the latter reflecting an end of month balance of $43,996.34. These
PC Reports were somewhat different from the earlier PC Reports because they stated, among other
things, that "[q]uarterly distributions to *certain* unsecured creditors have not been made" (italics
added), suggesting that McClinch may have made some payment to some unsecured creditors.

The December 2020 and January 2021 PC Reports also differed from the earlier filed PC
Reports because they both contain detail indicating how McClinch was spending the remaining funds
he had received in March 2019.  The December 2020 PC Report, ECF No. 196, reveals that,
although not paying his creditors, McClinch was disbursing the Thorpe Street proceeds to his
daughter Kimberly ($4,000.00); Bernstein Shur ($20,000.00); Spinglass Management ($7,000.00);
his wife Nancy McClinch ($18,000.00); Cross Land and Cattle, LLC ($11,000.00);[34] a florist

---

[34] Cross Land and Cattle, LLC is another of McClinch's wholly-owned companies.

14

($259.46); Ebay ($552.51); and on a variety of other personal expenses. In that month alone, McClinch spent over $66,000.00. The January 2021 PC Report, ECF No. 197, reflects additional personal and extravagant expenditures by McClinch, including over $15,000.00 to Gama Aviation (a company providing charter and maintenance service for jet aircraft); $18,000.00 to his wife, Nancy McClinch; $2,000.00 to Gene Hiller Stylists (an exclusive menswear store in Sausalito, California); $14,500.00 to Cross Land and Cattle, LLC; over $1,000.00 to Deluxe Foods of Aptos (a gourmet grocery store in Aptos, California), and $930.50 to "Postal designers." In January 2021, McClinch spent over $58,000.00.[35]

McClinch's failure to use the monies received from the Thorpe Street sale to fund the Plan and pay his unsecured creditors contradicts the assurances he and his counsel made previously to the U.S. Trustee and to this Court.[36] By his conduct, McClinch has demonstrated the need to convert his Chapter 11 case to Chapter 7 so that an independent trustee can take control of his remaining assets. Conversion — rather than dismissal — is in the best interests of McClinch's creditors because it is apparent that if not obliged to do so, McClinch will not use funds he receives to pay his creditors or fund his Plan, but rather will dissipate or hide those monies, leaving his unsecured creditors with little or nothing.

---

[35]Despite McClinch's claims of ill health, none of the PC Reports reflect significant medical expenses. To the contrary, the disclosed expenditures indicate that McClinch travels and enjoys a generally lavish lifestyle. Interestingly, the Reports also do not indicate any payments to creditors or for lodging, rent, and utilities.

[36] In addition to statements made to the U.S. Trustee and the Court prior to confirmation of the Plan, McClinch's counsel has assured the Court that "[f]ollowing confirmation, the Debtor has been working to meet his obligations under the Confirmation Order and Plan." ECF No. 181, ¶ 2. This assurance was made in August 2020, after McClinch had received the nearly $600,000 from the Thorpe Street Property deal. Notably, the August 2020 PC Report, ECF No. 192, states that plan payments have not been timely disbursed even though McClinch "disbursed" $59,302.13 that month.

As the Court has witnessed first hand, McClinch has spared no expense in attempting to escape his financial obligations to the ALM Trust. McClinch's conduct in the adversary proceeding not only has resulted in a dissipation of funds — presumably his counsel is being paid — that could have been used to repay creditors, but also has caused further harm to the ALM Trust by forcing it to bear the heavy cost of responding to his legal maneuvers.[37]

The ALM Trust submits that there is an abundance of factual support for the Court to convert McClinch's Chapter 11 case to Chapter 7 and that it is in the best interests of creditors to do so.

### III.    MEMORANDUM OF LAW

#### A.    Standards for Conversion to Chapter 7 Pursuant to 11 U.S.C. § 1112(b)

When a party in interest[38] files a motion to convert or dismiss a Chapter 11 case pursuant to 11 U.S.C. § 1112(b)(1), the bankruptcy court applies a two part inquiry: (1) does "cause" exist to convert or dismiss the case; and, if so, (2) is conversion or dismissal in the best interests of creditors and the estate? *See, e.g.*, *In re Hoover*, 828 F.3d 5, 8 (1st Cir. 2016) (citing 11 U.S.C. § 1112(b)(1)).

---

[37] The adversary case has been heavily litigated, with McClinch often taking meritless positions which the ALM Trust — and the Court — are then forced to address. Several of the more egregious examples are: (1) McClinch's assertion of "weaponized defenses" as baseless counterclaims against Trustee Palsa which required a motion to dismiss (Adv. ECF No. 45, at 16-20; Adv. ECF No. 50); (2) McClinch's denial that he had notice of the probate proceedings barring his counterclaims against Trustee Palsa under res judicata so that extra discovery and briefing was required (*see, e.g.*, Adv. ECF No. 93); and (3) a baseless motion to strike which required both a responsive brief and a sworn statement from a private investigator (Adv. ECF Nos. 33, 35, 42). *See* 11 U.S.C. § 105(a).

[38] The ALM Trust, as McClinch's largest unsecured creditor, is a "party in interest" and has standing to request conversion to Chapter 7. *See* 11 U.S.C. § 1109(b) (stating that a "party in interest," including a "creditor," "may raise and may appear and be heard on any issue in a case under this chapter."). "Generally, any person or entity, who holds a financial stake in the outcome of the debtor's estate, is a party in interest." *In re El Comandante Mgmt. Co., LLC,* 359 B.R. 410, 416-17 (Bankr. D.P.R. 2006), citing 7 Lawrence P. King, *Collier on Bankruptcy*, ¶ 1109.02[1] (15th Rev. Ed. 2006). *See also In re Sapphire Development LLC*, 523 B.R. 1, 6 (D. Conn. 2014) ("party in interest" standing extends to one with pecuniary interest in bankruptcy whether or not claim was filed or is disputed). Furthermore, the Court may *sua sponte* convert a Chapter 11 case to Chapter 7 even where no creditor moves for such relief. *Id.*, citing 11 U.S.C. § 105.

16

The moving party bears the initial burden of demonstrating that there is "cause" for either conversion or dismissal. *In re Francis*, No. BAP MB 18-012, 2019 WL 1265316, at *4 (B.A.P. 1st Cir. Mar. 14, 2019), citing *In re Andover Covered Bridge*, *LLC*, 553 B.R. 162, 171 (B.A.P. 1st Cir. 2016). Section 1112(b)(4) provides a "nonexclusive list of what constitutes cause" for purposes of § 1112(b)(1). *In re Francis,* 2019 WL 1265316, at *5, quoting *In re Colón Martinez*, 472 B.R. 137, 144 (B.A.P. 1st Cir. 2012) (citation omitted) (internal quotations omitted). Relevant to the instant motion, that list includes, *inter alia*: a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" (§ 1112(b)(4)(A)); the "gross mismanagement of the estate" (§ 1112(b)(4)(B)); the "unexcused failure to satisfy timely any filing or reporting requirement . . ." (§ 1112(b)(4)(F)); and the "material default by the debtor with respect to a confirmed plan" (§ 1112(b)(4)(N)). Each of the foregoing provides "cause" to convert or dismiss McClinch's Chapter 11 case.

"One ground is sufficient to establish cause under the statute." *In re Francis,* 2019 WL 1265316, at *4, citing to *In re Colón Martinez*, 472 B.R. at 144.[39] After the movant makes a showing of cause, "the burden shifts to the opposing party to demonstrate 'unusual circumstances' establishing that conversion or dismissal is not in the best interests of the creditors and the estate . . ." *In re Andover Covered Bridge*, 553 B.R. at 172 (citation omitted). If no such unusual circumstances exist, then "the bankruptcy court *must* convert or dismiss the case." *Id.* (emphasis in original, citation omitted). *See also In re Francis,* 2019 WL 1265316, at *5 ("after a finding of

_____

[39] Because a single "cause" is sufficient, the late filing of a MOR — easily and objectively verified by judicial notice of the court's own docket — often ends the "cause" analysis. *See, e.g., In re L&R Development & Investment Corp.*, BAP No. PR 19-044, 2020 WL 1862377 (B.A.P. 1st Cir. Apr. 13, 2020) (unpublished) (affirming dismissal of Chapter 11 case when docket showed that "Debtor repeatedly filed tardy MORs . . ." and district court found that movant "need not lump ancillary causes to dismiss to the one undisputedly established under 11 U.S.C. §1112(b)(4)(F) . . .").

17

cause, 'the court's discretion is limited; it must grant some form of relief unless § 1112(b)(2) applies.'") (citations omitted).

   In determining whether to exercise its discretion to convert or dismiss a Chapter 11 case, the Court considers what would be in the "best interests" of creditors and the estate. 11 U.S.C. § 1112(b).   Depending on the particular case, a wide variety of factors may be considered, but ultimately the "best interests" analysis boils down to which course of action will result in the largest number of creditors being paid the largest amount of money in the shortest amount of time. *See, e.g., In re Francis*, 2019 WL 1265316 at *5 (setting out variety of factors considered, but concluding that creditors "are generally 'best served by the course of action that results in the largest number of [them] being paid the largest amount of money in the shortest amount of time.'"), quoting *In re Aurora Memory Care, LLC*, 589 B.R. 631, 643 (Bankr. N.D. Ill. 2018) (other citations omitted).

   When analyzing the "best interests" of creditors and the estate, the courts consider, among other factors, what property will constitute the Chapter 7 estate upon conversion.  The issue can be complex because when a Chapter 11 plan is confirmed, ordinarily the property in the bankruptcy estate revests in the debtor unless the plan or order confirming the plan provides otherwise.   11 U.S.C. § 1141(b).   In the matter *sub judice*, however, the Plan contains numerous provisions mandating that the bankruptcy estate continues to exist post-confirmation until a final order is entered.  Accordingly, upon conversion, the Chapter 7 bankruptcy estate will include all property of the Debtor acquired before the date of conversion.  *See* 11 U.S.C. § 1115(a) (providing that when the debtor is an individual, property of the estate includes, in addition to the property specified in section 541, all property that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first).

18

In the Adversary Case, the ALM Trust has exposed McClinch's fraud and is seeking to revoke the Order confirming the Plan. But the claim for revocation will not be resolved immediately and McClinch has demonstrated that he will not use funds received from the sale of the Thorpe Street Property to pay his unsecured creditors. Accordingly, McClinch's Chapter 11 case should be converted to Chapter 7 so that a Trustee can exercise control over his remaining assets.

## B.    There is Overwhelming Cause for Conversion to Chapter 7

While one "cause" is enough for conversion to Chapter 7, there is overwhelming and irrefutable evidence demonstrating that there are numerous causes for conversion pursuant to Section 1112(b)(4)(A), (B), (F), and (N). The docket does not indicate that McClinch ever filed Official Form 426. A simple review of the docket demonstrates that McClinch has repeatedly filed monthly reports late.[40] *See also* discussion *infra* at 12-13. In the most recent PC Reports filed by McClinch, he states that he has not made quarterly distributions owed to certain creditors, indicates that payments have not been timely disbursed as required by the Plan, and further states that he "has not been able to fund certain post-petition debt in the ordinary course." *See* ECF Nos. 188-197.

McClinch's PC Reports also reveal that he received nearly $600,000 in March 2020 and, by the end of January 2021, had dissipated roughly $550,000 of that amount without making required payments to his creditors. His dissipation of those funds conclusively demonstrates a "substantial

---

[40]The failure to file accurate and timely MORs is a serious matter:

> Monthly operating reports "are much more than busy work imposed upon a Chapter 11 debtor for no reason other than to require it do something." . . . They are "the life blood" of chapter 11, enabling creditors to keep tabs on the debtor's post-petition operations. . . . Failure to file accurate and timely reports undermines the chapter 11 process and is considered a serious breach of a debtor's fiduciary obligations to creditors.

*In re Aurora Memory Care, LLC*, 589 B.R. 631, 639 (Bankr. N.D. Ill. 2018) (internal citations omitted).

or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," as well as "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4)(A), (B). *See also In re Hoover*, *supra*, 828 F.3d at 9 (confirming conversion to Chapter 7 when debtor had insufficient cash flow to pay debts so that estate was being diminished).

The ALM Trust has set forth a compelling and indisputable demonstration of "cause" for conversion pursuant to 11 U.S.C. § 1112(b).  The Court must now determine whether conversion to Chapter 7 or dismissal is in the best interests of creditors and the estate.

### C.  Conversion to Chapter 7 is in the "Best Interests" of Creditors and the Estate

At his Creditors' Meeting and when seeking Court approval of the Plan, McClinch and his counsel repeatedly represented that the proceeds from the sale of the Thorpe Street Property would be used to pay McClinch's creditors.  *See* discussion *infra*, at 9-10.  But in March 2020, McClinch received nearly $600,000 from Scinto Thorpe as proceeds from the Thorpe Street Property sale and did not use those monies to fund the Plan or make required payments to his creditors.  By the end of January 2021, McClinch had dissipated $550,000 of those monies and yet was unable to remain current with his post-petition debt, let alone pay his pre-petition creditors.

McClinch will ultimately receive an additional $2.6 million from the sale of the Thorpe Street Property to Scinto Thorpe LLC.  *See* **Exhibits B and C**. McClinch also has equity in the Congress Street Property that could be used to fund obligations to creditors.[41]  A Chapter 7 trustee also will be able to analyze both pre- and post-petition transfers made by McClinch and determine whether

---

[41] In the Plan, McClinch identified "the potential sale of the Congress Street Property" as another source of funding for his Plan obligations.  ECF No. 144, at 10 § 5.1.  When he filed his initial schedules, he valued the Congress Street Property at $2.5 million and indicated that Bank of America held a mortgage of $1.1 million.  ECF No. 22, at 5, 14. McClinch shares ownership with his wife and has significant equity in that property but does not reside there.

those transfers can be avoided and recovered for the estate. *See, e.g., In re Capra*, 614 B.R. 291, 298 (Bankr. N.D. Ill. 2020) (finding little risk that administrative fees would eat up funds available to creditors and, because estate had assets with equity and trustee could possibly recover preference and fraudulent conveyances, "conversion and appointment of a trustee would likely increase the assets available for distribution and ensure that those funds are fairly and equitably distributed among the creditors."). Unless his Chapter 11 case is converted to Chapter 7 and a trustee is appointed to manage the bankruptcy estate, it is likely that McClinch will rapidly dissipate (or hide) any further funds he receives, with the end result being that his unsecured creditors will receive little or nothing on their claims.

The ALM Trust anticipates that McClinch will seek dismissal of his bankruptcy case — rather than have it converted to Chapter 7 — so he is free to do as he wishes with the $2.6 million he will receive from Scinto Thorpe and any proceeds he receives from a sale of the Congress Street Property. The debtor's preference for dismissal, however, is entitled to little deference when it is in the best interests of creditors to convert the case to Chapter 7. *See, e.g.*, *In re Francis*, 2019 WL 1265316, at *6 (holding that "the Debtor's desire to extricate himself from bankruptcy does not impact the analysis" and rejecting Debtor's argument that "conversion would ruin his life . . .") (citations omitted). The Debtor "filed the bankruptcy voluntarily, after all, [repeatedly] taking advantage of the court and its processes and enjoying the shelter of the automatic stay." *Id.,* quoting *In re Del Monico*, No. 04 B 28235, 2005 WL 1129774, at *4 (Bankr. N.D. Ill. May 13, 2005). He "does not simply get to bid the court and [his] creditors farewell when it suits [him] . . ." *Id.*

In resolving whether dismissal or conversion is best in the context of a particular case, the courts will sometimes rely on a long checklist of standard factors that often is not helpful. *See, e.g.,*

21

*In re Aurora Memory Care, LLC*, 589 B.R. at 643 (disregarding checklist of standard factors because "[t]oo often, . . . those factors prove either neutral or inapplicable, making the multi-factor analysis unhelpful.") (citations omitted). Ultimately, the determining factor must be whether creditors are likely to fare better if the case is kept in bankruptcy rather than if it is dismissed. *See, e.g., In re Francis*, 2019 WL 1265316, at *5 (reciting lengthy list of typical factors considered,[42] but focusing on whether economic value of estate is greater in or out of bankruptcy) (citations omitted). If the estate has assets that a trustee can administer to benefit creditors, conversion rather than dismissal is in the "best interests" of creditors and the estate. "Where there are assets with equity, 'conversion is the better course.'" *In re Francis*, 2019 WL 1265316, at *6, quoting *In re Aurora Memory Care, LLC*, 589 B.R. at 643.

The ALM Trust seeks conversion to Chapter 7 so that an independent trustee can take control of the estate, marshall and/or liquidate any remaining assets (including claims to clawback or recover any improper or fraudulent transfers), and appropriately use any funds obtained to repay McClinch's

---

[42]While the Bankruptcy Code does not define "best interests" for purposes of the § 1112(b)(1) inquiry, the standard factors considered by the courts are:

> (1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal, (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted, (3) whether the debtor would simply file a further case upon dismissal, (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors, (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise, (6) whether any remaining issues would be better resolved outside the bankruptcy forum, (7) whether the estate consists of a "single asset," (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests, (9) whether a plan has been confirmed and whether any property remains in the estate to be administered, and (10)[ ] whether the appointment of a trustee is desirable to supervise the estate and address possible environment and safety concerns.

*In re Francis*, No. BAP MB 18-012, 2019 WL 1265316, at *5, quoting *In re Andover Covered Bridge, LLC*, 553 B.R. at 178. To the extent that they are relevant, these factors favor conversion.

22

unsecured creditors. Given that McClinch has failed to make even the modest quarterly payments[43]

to his unsecured creditors required by the Plan, it is unlikely that any creditor would support

dismissal as a better option than conversion.

In addition to considering the best interests of creditors, § 1112(b) also instructs the Court

to consider the best interests of the estate. At least one court has taken the view that protecting the

best interests of the estate includes protecting the bankruptcy process:

> If the Court were to permit a debtor who has systematically abused the bankruptcy process to walk away from all consequences of that misconduct, the Court should expect that other debtors will take note and conclude that filing false schedules and selling the estate property without court authorization is a risk-free alternative to obeying the rules.
>
> Here, the Debtor's misconduct was especially egregious. Because the Debtor repeatedly filed incomplete and inaccurate Schedules and SOFAs, he made it impossible for creditors, the UST, and the Court to get an accurate picture of his financial condition. This, in turn, makes it nearly impossible to evaluate potential avoidable conveyances, to evaluate a plan of reorganization, or to otherwise oversee the bankruptcy case as it should be. . . .
>
> For a court to allow a debtor to engage in such misconduct without consequence will only invite more of the same from future debtors. If one rewards bad conduct, one should expect to see more of it. This Court cannot run that risk by responding to the Debtor's depredations with no more than a Gallic shrug. Instead, the Court will send a different and more appropriate signal by converting this case to Chapter 7.

*In re Capra*, 614 B.R. at 299.

McClinch has used the bankruptcy process as a game to fend off creditors while still retaining

control over his assets and using those assets as he pleases. As the *Capra* Court so forcefully noted,

a debtor should not be permitted to flagrantly abuse the bankruptcy process without consequence.

---

[43]The Plan provides that "the Debtor shall make quarterly payments equal to the amount of the Allowed Unsecured Claims against the Debtor amortized over thirty years at an interest rate equal to the Federal Judgment rate of interest in effect on the Confirmation Date with a balloon payment for the remaining amounts owed in relation to the Class Three Claims to be made with the 40th quarterly payment under the Plan." ECF No. 144, at 10, § 4.4.

IV.    **CONCLUSION**

From the initial filing of his petition and continuing to the present, McClinch has systematically abused the bankruptcy process. McClinch not only failed to schedule the ALM Trust, his single largest unsecured creditor, but also repeatedly misrepresented the value of his assets and failed to provide information necessary for creditors and the Court to monitor his actions. Instead of using the nearly $600,000 he received from Scinto Thorpe to make the modest quarterly payments to all unsecured creditors mandated by the Plan, McClinch quickly dissipated those funds on lavish expenses. There are no unusual circumstances that could possibly justify McClinch's behavior, and the best interests of his creditors and the estate will be served by a conversion of his Chapter 11 case to Chapter 7.

**WHEREFORE,** Joseph A. Palsa, in his capacity as Trustee under the Arthur L. McClinch Trust Dated April 3, 1981, by and through his undersigned counsel, requests that the Court:

A.    Find that there is cause to convert the Debtor's Chapter 11 case to Chapter 7 and that conversion is in the best interests of creditors and the estate;

B.    Grant this motion for conversion of this Chapter 11 case to Chapter 7;

C.    Find that the Chapter 7 bankruptcy estate shall include all property of the bankruptcy estate as of the commencement of the case — including but not limited to: (a) McClinch's 100% ownership interest in 185 Thorpe Street Corp. and the $2,673,832.00 owed pursuant to the Note attached hereto as **Exhibit C;** and (b) McClinch's equity interest in the property located at 2661 Congress Street, Fairfield, Connecticut 06824 — and, pursuant to 11 U.S.C. § 1115, any property that McClinch has acquired after commencement of the case; and

D.    Award such other and further relief as the Court deems appropriate and just.

24

**CERTIFICATION OF PRE-FILING CONFERENCE**

Pursuant to D. Me. LBR 9013-1(b), I, Carl F. Schoeppl, Esq., hereby certify that prior to calendaring this Motion, I initiated several conferences with opposing counsel, D. Sam Anderson, Esq., in a good faith effort to determine whether or not the Motion is opposed but consent could not be obtained.

By:    **s/Carl F. Schoeppl**
Carl F. Schoeppl, Esq.

**STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)**

Joseph A. Palsa, in his capacity as Trustee under the Arthur L. McClinch Trust Dated April 3, 1981, by and through his undersigned counsel, hereby consents to the entry of final orders or judgment by this Bankruptcy Court.

Dated: April 2, 2021                              Respectfully submitted,

**SCHOEPPL LAW, P.A.**                     **LAW OFFICE OF JAY S. GELLER**
*Co-Counsel for Creditor*                  *Counsel for Creditor*
*THE ARTHUR L. MCCLINCH*            *THE ARTHUR L. MCCLINCH*
*TRUST DATED APRIL 3, 1981*          *TRUST DATED APRIL 3, 1981*
4651 North Federal Highway            Lunt Professional Building
Boca Raton, Florida 33431               74 Lunt Road, Suite 206
Telephone: (561) 394-8301              Falmouth, Maine 04105
Email: carl@schoeppllaw.com           Telephone: (207) 899-1477
                                                      Email: jgeller@jaysgellerlaw.com

By:    **s/Carl F. Schoeppl**
Carl F. Schoeppl, Esq.                     By:    **s/Jay S. Geller**
Admitted *Pro Hac Vice*                            Jay S. Geller, Esq.
Kyle G. DeValerio, Esq.
Admitted *Pro Hac Vice*

25

## <u>CERTIFICATE OF SERVICE</u>

I, **Jay S. Geller**, hereby certify that, on April 2, 2021, I caused a true and correct copy of the foregoing Motion by Creditor the Arthur L. McClinch Trust Dated April 3, 1981 for Conversion to Chapter 7 Pursuant to 11 U.S.C. § 1112 with Incorporated Memorandum of Law to be filed via the Court's CM/ECF electronic filing system ("CM/ECF"), which sent notice to all interested parties receiving notification of filings through CM/ECF.

By:    <u>**s/Jay S. Geller**</u>
Jay S. Geller, Esq.

26