Page 1

1    PROCEEDINGS:         TERRY MCCLINCH 341 CREDITORS MEETING

2    DATE:               DECEMBER 4, 2018

3    TRANSCRIBED BY:     ROBIN TRUDEAU, FPR

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2                    * * * * * * * *

3          MR. MORAL:  Okay.  It is December 4, 2018, and

4     Eastern time it's seven minutes after 1:00.  We are

5     here for the first meeting creditors, or a continued

6     first meeting of creditors of three cases, Terrance

7     J. McClinch, and that is case number 18-10568.

8     We're also here for the meeting of creditors in

9     Circle 9 Cattle Company, 18-10569, and Candlelight

10    Farms Aviation, LLC, case number 18-10579.  My name

11    is Steve Moral, I'm the assistant United States

12    trustee in Portland, Maine.  In the meeting room

13    with me, I'm accompanied by Amy Gudreaux [phonetic],

14    who is the supervising auditor.  She's an analyst

15    and is the person who does the hands-on review of

16    financial information coming into our office.  The

17    debtor for the audio recording is appearing by video

18    teleconference, and he's physically located right

19    now in the U.S. trustee's office in Phoenix,

20    Arizona; is that right?

21         MR. GRIFFITH:  Correct.

22         MR. MORAL:  And accompanying you is -- I'm

23    sorry, I forgot your name already, but you're an

24    employee --

25         MR. GRIFFITH:  My name is Dale Griffith, I'm

1    with U.S. trustee's office here in Phoenix, Arizona.

2    MR. MORAL:  Thank you, Mr. Griffith.  In the

3    meeting, the debtor are represented by the Law Firm

4    of Bernstein, Shur, Sawyer & Nelson, Sam Anderson

5    and Adam Prescott are here.  Randy Kresswell

6    [phonetic] is here representing --

7    MR. KRESSWELL [phonetic]:  TPL Financial

8    Services.

9    MR. MORAL:  Tim Norton is here representing?

10   MR. NORTON:  Coastal Realty Capital.

11   MR. MORAL:  You folks, you want to weigh in

12   here?

13   MR. SMART:  Mika Smart representing Joseph and

14   Madeline Lawnsky [phonetic].

15   MS. CALDWELL [phonetic]:  Bodi Caldwell

16   [phonetic] on behalf of First Interstate Bank.

17   MR. MOORE:  Martin Moore, Coastal Designers and

18   Consultants, Inc.

19   MR. MORAL:  And Mr. Moore, you're representing

20   yourself today; is that right?

21   MR. MOORE:  Yes, sir.

22   MR. MORAL:  So, we're going to do this meeting

23   in four parts.  We're going to get sort of a general

24   understanding of what's going on in these cases and

25   try to focus in on what's important, and I

1    understand sort of the major event that we want to

2    vet a little bit of course is the prospective sale

3    of the cattle ranch.  Then, we are going to address

4    Mr. McClinch, the various financial disclosures that

5    you've already made in connection with the case that

6    was involved in your voluntary petition, your

7    statements of assets and liabilities, and the

8    information on the statement of financial affairs

9    for each of the debtors, yourself and the two LLCs.

10   Once we have your verification of the truth and

11   accuracy of that information, the third part of this

12   meeting will be devoted to me explaining what your

13   obligations are as debtor in possession and the

14   principal of two Chapter 11 debtors, and when we're

15   done with that, creditors will have an opportunity

16   to examine Mr. McClinch.  I want to remind,

17   particular for the benefit of those who aren't

18   represented by an attorney here, I am not a judge.

19   This is not a court.  This is a relatively informal

20   proceeding, and as long as we can work on a

21   constructive basis, there will be a fair bit of give

22   and take, and there won't be any objections to

23   questions unless they start to stray away from the

24   precise reason why we're here, which is to provide

25   creditors with information relative to their claims,

Page 5

1    and how the debtor proposes to pay those claims,

2    that's the extent of the questions that should be

3    posed, and I will sound like a judge if I think that

4    you've gone across the line.  Other than that,

5    Mr. McClinch, and I understand that you're here

6    after dealing with some serious logistics.  Are you

7    feeling ready to answer a few questions?

8         MR. MCCLINCH:  Yes.

9         MR. MORAL:  Okay.  All right.  Is there

10   anything I should know before I start asking

11   questions about any circumstances under which it

12   would be difficult for you to answer questions

13   today?

14        MR. MCCLINCH:  No, I'm prepared to answer any

15   and all questions.

16        MR. MORAL:  Okay.  Thank you very much, sir.

17   We should make sure that the record is clear.

18   Mr. McClinch has produced a Montana driver's

19   license, and also a, I guess it's a Medicare health

20   insurance card.  Mr. McClinch, do you happen to know

21   whether your Medicare claim number and your social

22   security number align?

23        MR. MCCLINCH:  I believe they do.  I think -- I

24   can pull it out.

25        UNIDENTIFIED SPEAKER:  I verify [indiscernible]

Page 6

1    to his card, and they match.

2         MR. MORAL:  Okay.  Good.  With that said, we

3    can proceed.  Mr. McClinch, would you raise your

4    right hand, please?  Do you solemnly swear to tell

5    the truth, the whole truth, and nothing but the

6    truth in this proceeding this afternoon?

7         MR. MCCLINCH:  I do.

8         MR. MORAL:  Thank you.  Let's start with the

9    financial disclosures, and do you have a copy of the

10   petition, and the schedules, and the statement of

11   financial affairs?

12        UNIDENTIFIED SPEAKER:  Schedules --

13        MR. MCCLINCH:  I have various documents that

14   were just put in front of me about five minutes ago.

15        UNIDENTIFIED SPEAKER:  I don't know about the

16   petition, Steve.  I asked Shawn Baker to coordinate

17   with the UST's office in Arizona for the schedules

18   and statement of financial affairs, so I know he has

19   those.  I don't know about the petitions.

20        MR. MORAL:  Okay.  I don't want to prolong this

21   longer than I need to, Mr. McClinch, but is it

22   possible that you have your voluntary petition in

23   front of you?

24        MR. MCCLINCH:  Yes, it's right here, yes.

25        MR. MORAL:  And would you turn to -- I think

Page 7

1    it's the fourth -- the sixth page of that document?

2         MR. MCCLINCH:  Okay.

3         MR. MORAL:  On the sixth page there is a

4    signature on my copy.  Do you see a signature there?

5         MR. MCCLINCH:  Yes, my signature.

6         MR. MORAL:  It's your signature.  Do you recall

7    signing the document?

8         MR. MCCLINCH:  Yes.

9         MR. MORAL:  Around September 27, 2018?

10        MR. MCCLINCH:  Correct.

11        MR. MORAL:  Okay.  I think we can move right

12   forward to the statement of assets and liabilities.

13        MR. MCCLINCH:  Okay.  I have that.

14        MR. MORAL:  And I would like you to just page

15   by page, just scan the information because when

16   you're done, I'm going to ask you whether the

17   information contained on these schedule of assets

18   and liabilities that pertain to your case, the

19   McClinch case, I'm going to ask you if that

20   information is true, accurate, and complete to the

21   best of your knowledge, okay?

22        MR. MCCLINCH:  Okay.

23        MR. MORAL:  So, go ahead and let's go through

24   that, then.

25        MR. MCCLINCH:  There's a lot here.

Page 8

1        MR. MORAL:  I know.  Take your time.

2        MR. MCCLINCH:  Okay.

3        MR. MORAL:  And maybe I can help a little bit

4    by asking you, as you go through this, if the

5    information you're looking at includes all of your

6    personal assets and all of your personal

7    liabilities.

8        MR. MCCLINCH:  Okay.  I'm on page two, and you

9    know, it all looks accurate to me.

10       MR. MORAL:  So far.

11       MR. MCCLINCH:  Yeah -- page three indicates

12   $35,000 in Stockman Bank, and I believe it's $5,000

13   now, page four.

14       MR. MORAL:  I'm not sure we're looking at the

15   same thing, Mr. McClinch.

16       MR. MCCLINCH:  Okay.  This is all the items,

17   all the personal items.

18       MR. MORAL:  Okay.  You're looking at your list

19   of personal property?

20       MR. MCCLINCH:  Yes.

21       MR. MORAL:  Okay.  I got you, question 17?

22       MR. MCCLINCH:  Yes.

23       MR. MORAL:  And you say that your bank balance

24   at Chase or Stockman Bank has changed?

25       MR. MCCLINCH:  To $5,000.

1        MR. MORAL:   Okay.   Why don't we pause right

2    there.   The form says that your balance at Stockman

3    Bank as of the date of the petition was $35,965.81,

4    and you say today the balance is significantly less.

5    What accounts for the difference?

6        MR. MCCLINCH:   I've produced all the checks

7    that were written.   You know, a lot of it is

8    transferred to ranch expenses and I would say I've

9    had to rent a place down here, that would account

10   for some of it.   Sam, do you have the checks, the

11   copies?

12       MR. ANDERSON:   I don't have them, but if

13   they've been produced, Carla or Shawn Baker may have

14   them, but I don't have them yet because they would

15   be the ones putting together the operating reports,

16   which we've been trying to retain, spend less to

17   help with, but everybody's up in arms about that, so

18   it's been difficult.

19       MR. MCCLINCH:   Sam?

20       MR. ANDERSON:   Yes?

21       MR. MCCLINCH:   Can Carla just send that over?

22       MR. ANDERSON:   We can send that over, sure.   If

23   we have them we'll forward them.

24       MR. MCCLINCH:   That would detail every item.   I

25   mean, it's a copy of every check.

Page 10

1          MR. ANDERSON:  I think we have them through

2     October, I believe.

3          MR. MORAL:  All right.

4          MR. MCCLINCH:  Until October 30.

5          MR. ANDERSON:  Yes.

6          MR. MCCLINCH:  You have them through October

7     31.

8          MR. ANDERSON:  Yeah.

9          MR. MORAL:  I think I heard you say that some

10    of the checks are for the ranch's expenses?

11         MR. MCCLINCH:  Correct.

12         MR. MORAL:  That shouldn't be happening.

13         MR. ANDERSON:  No, that's been made clear.

14    We'll take a look at that because that's been

15    discussed, as you might imagine, on many occasions.

16    And there are mechanisms for funding the ranch

17    expenses and for funding the airport expenses, which

18    is the Thorp Street relationship, which we spent a

19    lot of time with Judge Figoni [phonetic] on at the

20    last hearing.  So, I don't know if you want to get

21    into this now, or later, or not at all, but there

22    are mechanisms by which the expenses of the Chapter

23    11's of the two businesses will be funded with

24    proceeds from Thorp Street, which is not a debtor,

25    which is an entity that sits outside of the

Page 11

1    bankruptcies.

2        MR. MORAL:  Right.

3        MR. MCCLINCH:  Sam, it would be helpful to just

4    email to you all those checks.

5        MR. ANDERSON:  I think she can, if she has

6    them.

7        MR. MORAL:  We'll follow up with your counsel

8    on the details.  Thank you very much for bringing

9    that to my attention.  Mr. McClinch, would you tell

10   me your relationship to the following entities, 185

11   Thorp Street Corporation, what's your relationship?

12       MR. MCCLINCH:  I'm the owner of that entity.

13       MR. MORAL:  And what does that entity do for

14   business?

15       MR. MCCLINCH:  185 Thorp Street Corporation

16   owns land and some buildings at 185 Thorp Street

17   location.

18       MR. MORAL:  Where is 185 Thorp Street?

19       MR. MCCLINCH:  That's in Fairfield,

20   Connecticut.

21       MR. MORAL:  All right.

22       MR. MCCLINCH:  And hopefully on Thursday we

23   will receive approval for an old Jewish home for the

24   elderly that my partner will be, you know, writing a

25   check and taking me out of the entity, so.

Page 12

1          MR. MORAL:  What's your partner's name?

2          MR. MCCLINCH:  Robert Scinto, S-C-I-N-T-O, he

3     is a huge developer in Fairfield County,

4     Connecticut.

5          MR. MORAL:  You say he's your partner?

6          MR. MCCLINCH:  Yes.

7          MR. MORAL:  You're disclosure indicates the 185

8     Thorp Street Corporation is owned 100 percent by

9     you?

10         MR. ANDERSON:  That's true.

11         MR. MCCLINCH:  That's true.

12         MR. ANDERSON:  Yeah, maybe I can weigh in on

13    this, and I don't know a whole lot about Thorp

14    Street because it has its own counsel, a guy by the

15    name of Michael Goldman who's been involved all

16    along, but Thorp Street actually was a piece of

17    land, effectively, that 185 Thorp Street, or Terry

18    bought out of a bankruptcy a number of years ago,

19    well before my involvement, R.D. Scinto, or Bob

20    Scinto, R.D. Scinto is the actual entity that

21    operates on this through Bob Scinto.  Bob Scinto is

22    a fairly well known developer in Southern

23    Connecticut, and what has happened is that Scinto

24    has funded the remediation and development of the

25    property, and when the property sold, Scinto will

1    get back his money that he's put into it, and then

2    there's a waterfall of sale proceeds after he gets

3    his hard money back.  So, if it sells for a certain

4    amount, then there's an 80/20 split, and then it

5    goes in favor of 185 Thorp Street, or Terry, and

6    then it goes 85/15 and then 90/10 if it gets to a

7    certain amount.  So, what Terry is referring to is

8    they've been try to get it zoned to do this

9    development of Jewish Home for the Elderly.  If that

10   happens, there's a pretty good chance that Scinto

11   will, in essence, buy the project and take it over,

12   paying a certain amount for it, which will then be

13   funneled through the waterfall.  So, he's not a

14   partner in the sense of legal partnership.

15      MR. MORAL:  Tell me if I understand it

16   correctly, the partnership that he's referring to is

17   the partnership between 185 Thorp Street and Mr.

18   Scinto.

19      MR. ANDERSON:  R.D. Scinto, yeah, that's the

20   entity, yeah.

21      MR. MORAL:  Entity.  And the two of them are in

22   partnership in connection with the development and

23   ultimate sale of the real estate, and he's saying

24   that the purpose for the real estate is for a -- did

25   you say a Jewish --

Page 14

1       MR. MCCLINCH:  Jewish Home for the Elderly.

2       MR. ANDERSON:  That's right.  So, I don't know

3  if you call them co- venturers or it's a joint

4  venture, I don't know what it is legally speaking,

5  but Terry, in essence, put the land in, Scinto is up

6  front, the development cost --

7       MR. MORAL:  I understand.

8       MR. ANDERSON:  -- and then they split the sale

9  proceeds in a particular way.

10      MR. MORAL:  Thank you.

11      MR. MCCLINCH:  Sam?

12      MR. ANDERSON:  Yeah?

13      MR. MCCLINCH:  I just want to add that this has

14  been a huge drain on my resources for 12 years, a

15  huge drain.

16      MR. MORAL:  Okay.  Well, it sounds like it's

17  headed in the right direction.  You expect an offer

18  on Thursday?

19      MR. ANDERSON:  Well, that's the zoning hearing.

20      MR. MCCLINCH:  Yeah, we're expecting zoning

21  approval on Thursday.

22      MR. MORAL:  Okay.  Can you tell me what your

23  relationship is to Black Dog Fuel, LLC?

24      MR. MCCLINCH:  I'm a partner in Black Dog Fuel.

25  Black Dog Fuel is what was created solely to protect

Page 15

1    ourselves, you know, from any kind of liability with

2    fuel, and it's solely for fuelling airplanes at

3    Candlelight Farms Airport.

4        MR. MORAL:  Okay.  You say it's a partnership?

5        MR. MCCLINCH:  Yeah, it's an LLC, yes.

6        MR. MORAL:  Do you have a partner?

7        MR. MCCLINCH:  There's probably six or seven

8    partners that participate in Black Dog, and they use

9    the fuel truck to refuel their airplanes, and we

10   didn't want any kind of liability, you know, in

11   terms of fuelling the airplanes, you know, to reach

12   us individually.

13       MR. MORAL:  Black Dog sells fuel at the

14   airstrip in Connecticut?

15       MR. MCCLINCH:  Well, to the partners, only to

16   the partners that are involved.

17       MR. MORAL:  Okay.

18       MR. MCCLINCH:  So, there's six or seven

19   partners, and they refuel their aircraft.

20       MR. MORAL:  I get it.  Thank you.

21       MR. MCCLINCH:  Okay.

22       MR. MORAL:  120 Commercial Street Realty, LLC.

23       MR. MCCLINCH:  Yes.

24       MR. MORAL:  What's your relationship to that?

25       MR. MCCLINCH:  That has been sold to -- Sam,

1    what's the name of the guy --

2         MR. ANDERSON:  I don't actually -- yeah, I

3    don't remember his name.

4         MR. MCCLINCH:  Bristol Marine.  120 Commercial

5    Street was the owner of the shipyard property.

6         MR. MORAL:  This is in Booth Bay Harbor?

7         MR. MCCLINCH:  Yes, and since it was sold.

8         MR. MORAL:  So, it was the owner of Real

9    Property in Booth Bay Harbor?

10        MR. MCCLINCH:  Correct.

11        MR. MORAL:  When was that property sold?

12        MR. ANDERSON:  It closed on December 29, 2017,

13   so just under a year ago.

14        MR. MORAL:  Okay.

15        MR. ANDERSON:  So, just on this point, because

16   in fact Randy knows a fair amount about this too,

17   120 Commercial Street is the real estate holding

18   company that upon which this shipyard operated, and

19   it was literally, or is literally a shipyard.  They

20   generally work on government contracts to refurbish

21   things like old schooners and that kind of stuff.

22   So, I don't know when Terry bought that business,

23   but he had operated it for a number of years and

24   then it was sold in December of last year.  So, both

25   the real estate and the operations were sold in that

Page 17

1       transaction.

2               MR. MCCLINCH:  Yeah, I bought that in '04.

3               MR. ANDERSON:  '04, there you go.

4               MR. MORAL:  Okay.  Sold in 2017.

5               MR. ANDERSON:  That's right.

6               MR. MORAL:  About ten months prior to the

7       petition.

8               MR. ANDERSON:  Right.

9               MR. MORAL:  Where did the money go?

10              MR. ANDERSON:  The money went -- I lot of it

11      went to creditors, and then a lot went to -- some of

12      it went to Terry, so.

13              MR. MORAL:  Okay.

14              MR. ANDERSON:  I mean, I can elaborate, but I'm

15      not sure it's super interesting.

16              MR. MORAL:  We may follow up.

17              MR. ANDERSON:  Okay.

18              MR. MORAL:  Okay.  What is your relationship

19      currently to Booth Bay Harbor Shipyard, LLC?

20              MR. MCCLINCH:  That was sold.  I have no

21      relationship at this time.

22              MR. ANDERSON:  That's the operating company

23      that operated the shipyard.

24              MR. MORAL:  The shipyard itself.

25              MR. ANDERSON:  Yeah.

Page 18

1        MR. MORAL:  And your relationship to Northeast

2    Marine Construction, LLC?

3        MR. MCCLINCH:  That was -- it just dissolved.

4    It's not operating anymore.  I think the LLC still

5    exists, but I'm going to, you know, apply to

6    dissolve that LLC.

7        MR. MORAL:  Were those operations also related

8    to the Booth Bay Shipyard?

9        MR. MCCLINCH:  No.

10        MR. ANDERSON:  Kind of.  It was a separate

11    operating business in the business of building piers

12    effectively, so it didn't own any real estate.  It

13    rented space and bought like a barge and other

14    things that you would use to do pier construction.

15        MR. MORAL:  All right.

16        MR. ANDERSON:  In fact, the seller of that to

17    us was Mika's [phonetic] client, not his current

18    client, but a former one.  So, it was a seller

19    financed deal that, unfortunately, you know, we

20    couldn't make the payments on, so there was a

21    default.  And ultimately, I think your client took

22    back the assets in a secured party sale, although

23    that's never been entirely clear to me.  The assets

24    were not worth a whole lot.  It was like, in fact,

25    the barge, which was the primary asset, was sitting

Case 18-10568   Doc 198-1   Filed 04/02/21   Entered 04/02/21 15:16:48   Desc Exhibit
Ex. A - Creditors Mtg Transcript   Page 19 of 91

Page 19

1    at the shipyard and has been a liability, not an

2    asset, so.

3        MR. MORAL:  And finally, what is your

4    relationship to Crossland and Cattle, LLC?

5        MR. MCCLINCH:  I'm the owner of Crossland and

6    Cattle, and any kind of bills, payroll goes through

7    Crossland and Cattle, and Crossland and Cattle was

8    to be the operating company [indiscernible] holds

9    the real property.  So, it was a way of protecting

10   that asset, the ranch itself.

11       MR. MORAL:  Are there any operations at the

12   ranch currently?

13       MR. MCCLINCH:  Yes.  We have cattle in there,

14   about 200 head, and actually, the guy who had the

15   cattle there is in the process of buying the ranch.

16   He's now in a lease [indiscernible].

17       MR. MORAL:  Hang on just a moment.  Our

18   connection, or audio connection has been bad.  It's

19   almost as if somebody's rubbing against a

20   microphone.

21       UNIDENTIFIED SPEAKER:  I think he was doing

22   this.

23       MR. MORAL:  Okay.  All right.  Thanks.  I'm

24   sorry.  You were telling us that the person who owns

25   the cattle that are at the ranch is -- is he the

Page 20

1    prospective buyer of the ranch?

2         MR. ANDERSON:  He is.

3         MR. MCCLINCH:  Yeah.  Dr. David Shuett, he is

4    in the agricultural and cattle lease on Circle 9

5    since I owned it.  So, he pays, you know, an amount

6    per day, and he also does all the farming on the

7    ranch.

8         MR. MORAL:  What type of farming takes place

9    there?

10        MR. MCCLINCH:  He grows some alfalfa, hay, so

11   he produces hay which is used to feed the cattle in

12   the winter.

13        MR. ANDERSON:  You can correct me if I'm wrong

14   here, Circle 9 I don't think was really purchased to

15   make money as an operating ranch.  It was kind of

16   designed to buy and then sell, which is obviously

17   what we're in the process of doing.

18        MR. MORAL:  Is there rent currently being paid,

19   either to Crossland or to Circle 9?

20        MR. ANDERSON:  My understanding of that is that

21   Dr. Shuett put capital investment into the ranch,

22   and then offsets that capital improvement with the

23   rent payments.  So, specifically, he put in a bunch

24   of pivots, which are -- the only way that I can --

25        MR. MCCLINCH:  It's irrigation.

Page 21

1          MR. ANDERSON:  It's irrigation.  If you've ever

2     been in a plane, you look down in the Midwest, and

3     you see these circles of growth amongst non-growth,

4     those are pivots, I think.  So, they turn around in

5     a circular fashion and irrigate.

6          MR. MORAL:  They're sprinklers.

7          MR. ANDERSON:  Huge sprinklers.  So, he put a

8     bunch of huge sprinklers pivots on the property, and

9     the idea is that he would offset the rent for the

10    ranch against the cost of the pivots, and at the end

11    of a ten year lease period, the pivots would be

12    owned by Circle 9.

13         MR. MORAL:  And how many years are we into the

14    ten year term, five?

15         MR. ANDERSON:  And that's all part of the sale,

16    transaction.

17         MR. MORAL:  All part of the purchase?

18         MR. ANDERSON:  Yeah.

19         MR. MORAL:  Proposed offer?

20         MR. ANDERSON:  Exactly.

21         MR. MORAL:  By the way, have you accepted the

22    offer --

23         MR. ANDERSON:  We have.

24         MR. MORAL:  -- subject to court approval?

25         MR. ANDERSON:  We accepted on Friday, subject

Page 22

1     to court approval.

2          MR. MORAL:  What is the price?

3          MR. ANDERSON:  You'll tell me if I got this

4     wrong, it's 5.129 -- yeah, 5.129.

5          MR. MORAL:  Okay.  We can go into further

6     detail, either if a credit wants to, or --

7          UNIDENTIFIED SPEAKER:  Minus the offset, right?

8          MR. ANDERSON:  Yeah, and there's an offset

9     against the purchase price for the residual value of

10    the pivots.

11         MR. MORAL:  Sure.  Yeah, okay.  Let's keep

12    going through the pages, Mr. McClinch.  I'm looking

13    at, but don't have any follow up questions on

14    page -- it's hard to read this, I guess it's page

15    ten of 51, these are still questions relating to

16    assets.  I'm now looking at official form 106C,

17    which is your list of exempt property.  Foremost is

18    a claim you make for a homestead residence in Booth

19    Bay.  Do you see that?

20         MR. MCCLINCH:  What page are you on?

21         MR. MORAL:  It is page 13 of 51.  It's official

22    form 106C, which is entitled the property you claim

23    as exempt.  Part one is identifying the property

24    that you claim as exempt.  And the first listing is

25    a property with an address at 5 and 11 Allie Road

Page 23

1     [phonetic], East Booth Bay, Maine in Lincoln County

2     with an estimated value of $995,000.  An exemption

3     claim of $95,000, and a reference to the main

4     statute that supports it.  Do you see that?

5          MR. MCCLINCH:  I have it in front of me, yes.

6          MR. MORAL:  Where do you live?

7          MR. MCCLINCH:  I've been living in Montana, and

8     I intended to live in Montana, however, I had an

9     event that has changed that.

10         MR. MORAL:  A medical event?

11         MR. MCCLINCH:  Yes.  I'm in heart failure, and

12    because of the elevation I had to come to Phoenix.

13         MR. MORAL:  Just tell me, what the Allie

14    [phonetic] Road property in East Booth Bay consists

15    of.

16         MR. MCCLINCH:  It's a house.  It's a full year

17    round house.  It's during the winter I keep it

18    heated, the water is running, and there's a cottage

19    that's on the property that's over 100 years old.

20    And it's a three season cottage.  It's right on the

21    water.  You could never build along there.

22         MR. MORAL:  Right, zoning.

23         MR. MCCLINCH:  The environmental regulations.

24         MR. MORAL:  Is it occupied?

25         MR. MCCLINCH:  No -- no.

Page 24

1         MR. MORAL:  When was it last occupied by you?

2         MR. MCCLINCH:  A year ago.

3         MR. MORAL:  It's been unoccupied for a year?

4         MR. MCCLINCH:  Yes.  And it's been listed for

5    sale, and it's shown frequently.

6         MR. MORAL:  Are there any -- have there been

7    any offers?

8         MR. MCCLINCH:  No.

9         MR. ANDERSON:  Terry, were you there early this

10   year because I remember you being there when we sold

11   the shipyard in December of '17, and I thought you

12   went up to Montana in March?

13        MR. MCCLINCH:  April.

14        MR. ANDERSON:  I think he may have been there

15   the first quarter of '18 -- April, yeah, but.

16        MR. MORAL:  Have you received any offers?

17        MR. MCCLINCH:  No, no offers yet.

18        MR. MORAL:  Who is it listed with?

19        MR. MCCLINCH:  It's listed with Joanne Tate

20   [phonetic].  She has an agency in Brunsworth, Maine,

21   and it's [indiscernible].

22        MR. MORAL:  Is she going to be retained?

23        MR. ANDERSON:  We think so.  I mean, we haven't

24   been -- I haven't been hugely --

25        MR. MORAL:  You haven't focused on that part

1    yet?

2         MR. ANDERSON:  Well, I haven't been impressed

3    with the lack of offers, so.

4         MR. MORAL:  Okay.  Fair enough.

5         MR. MCCLINCH:  She's been retained through

6    December 31.

7         MR. ANDERSON:  Under the pre-petition listing

8    agreement he means.

9         MR. MORAL:  Okay.

10        MR. MCCLINCH:  Retained through December 31 of

11   this year.

12        MR. MORAL:  Thank you.  That's very helpful.

13   I'm now looking at form 106D, which is creditors

14   that have security.  Would you just look at that

15   list that begins with Bank of America.

16        MR. ANDERSON:  So, it's page 14 of 51 I think,

17   Terry, at the top.

18        MR. MCCLINCH:  Yeah, I have this in front of

19   me, yes.

20        MR. MORAL:  Okay.  Just check that, and this is

21   probably a good time to go over what we've talked

22   about so far.  And my question is, so far, is the

23   information that is set forth in these forms true,

24   accurate, and complete to the best of your

25   knowledge?

1          MR. MCCLINCH:  Yes.

2          MR. MORAL:  Okay.  Now, we're looking at

3     unsecured claims, would you please refer to the

4     several pages of unsecured creditors?

5          MR. ANDERSON:  So, starting on page 18, Terry,

6     of 51.

7          MR. MCCLINCH:  Okay.  I've got 106D in front of

8     me.

9          MR. MORAL:  Yeah.  I see Mr. Scinto is listed.

10         MR. MCCLINCH:  Yes.

11         MR. MORAL:  I may have missed it, but I don't

12    see Mr. Martin's name -- Mr. Moore rather.

13         MR. MCCLINCH:  Well, I thought he was listed as

14    unsecured creditor.

15         MR. MORAL:  Do you see that on the schedules?

16         MR. MCCLINCH:  No, I don't.

17         MR. ANDERSON:  Coastal Designers is on page 20.

18         MR. MORAL:  Okay.  All right.  Mr. Moore,

19    that's your company?

20         MR. MOORE:  Yes, it is.

21         MR. MORAL:  Okay.  And have you seen this?

22    It's just a listing of your claim?

23         MR. MOORE:  Okay.  Yeah.

24         MR. MORAL:  I'm not going to ask you any

25    questions about it.  I just wanted to make sure

Page 27

1       that --

2            MR. MOORE:   That's correct.

3            MR. MORAL:   -- name and address.   Okay.   Great.

4       Thank you.   The next form is form 106H, and it is a

5       listing of entities that owe the same debts that you

6       do.   And the listing is, again, for 185 Thorp

7       Street.   You list Circle 9, Crossland and Cattle,

8       Nancy McClinch.

9            MR. ANDERSON:   This is page 33, Terry, of 51.

10           MR. MORAL:   Nancy McClinch, his wife?

11           MR. ANDERSON:   Yes.

12           MR. MORAL:   Okay.

13           MR. MCCLINCH:   I have 106H.

14           MR. MORAL:   Yeah.   Is that the list of all the

15      entities that owe money that you owe?

16           MR. MCCLINCH:   This is co-debtors?

17           MR. MORAL:   Yeah.

18           MR. ANDERSON:   Yeah.

19           MR. MCCLINCH:   Okay.

20           MR. MORAL:   So, they're either guarantors, or

21      co-obligors on liabilities of yours.

22           MR. MCCLINCH:   Yes.

23           MR. MORAL:   That's the complete list?

24           MR. MCCLINCH:   To the best of my knowledge, it

25      is.

Page 28

1        MR. MORAL:  Thank you.  Now, I'm looking at

2   official form 106I, which is a disclosure of your

3   income.  Is that information correct?

4        MR. MCCLINCH:  Yes.

5        MR. MORAL:  The next form is 106J, which is a

6   disclosure of your monthly expenses.  Is that

7   information correct?

8        MR. MCCLINCH:  I'm not there yet.

9        MR. MORAL:  Okay.

10       MR. ANDERSON:  Page 37, Terry, at the top.

11       MR. MCCLINCH:  Okay.  I'm just reviewing it

12  now.  Okay.  To the best of my knowledge, this is

13  correct.

14       MR. MORAL:  Now, 106J is your expenses.

15       MR. MCCLINCH:  Yes.

16       MR. MORAL:  Is that information correct?

17       MR. MCCLINCH:  Yeah, to the best of my

18  knowledge.  There's a lot here.

19       MR. MORAL:  Right.

20       MR. MCCLINCH:  So, I can say to the best of my

21  knowledge, it is correct.

22       MR. MORAL:  Okay.  And the next page is form

23  106DEC, which is the declaration concerning your

24  schedules, and I have a copy that has a place for

25  your signature.  Do you have your signature in front

Page 29

1   of you?

2        MR. MCCLINCH:  I have one of this, and it

3   wasn't signed -- wait a minute.

4        MR. MORAL:  It's page 39 of 51.

5        MR. MCCLINCH:  Yeah, 106D, declaration of

6   individual debtors.

7        UNIDENTIFIED SPEAKER:  It's electronically

8   signed on his copy.

9        MR. MORAL:  That's right.  All right.  So, it's

10  just a slash s slash.

11       MR. ANDERSON:  Well, that's what this is, but

12  he I think has signed it and sent them back, but we

13  have not received them back yet.

14       MR. MORAL:  Okay.  Mr. McClinch, your attorney

15  tells me that he's informed that you've signed this,

16  but you haven't returned it to him.

17       MR. MCCLINCH:  Correct.

18       MR. MORAL:  When will he have those?

19       MR. MCCLINCH:  I can start to get it together.

20  Some of the -- a lot of this is probably in Montana,

21  at my cabin in Montana.  I'd like to have someone go

22  through and, you know, retrieve the documents.

23       MR. ANDERSON:  Which is right.  He wanted to

24  sign them in Montana.

25       MR. MCCLINCH:  I had to leave Montana in a

Page 30

1    rush, so, you know.

2        MR. MORAL:  Would you get that process

3    underway, please?

4        MR. MCCLINCH:  Yes, I will.

5        MR. MORAL:  Thanks.  And would you guys agree

6    to facilitate that process?

7        UNIDENTIFIED SPEAKER:  We've been working on

8    it.

9        MR. ANDERSON:  Yes.

10       MR. MORAL:  Thanks.  Now, I'm looking at the

11   statement of financial -- I'm looking at the

12   statement of financial affairs.

13       MR. MCCLINCH:  Can I sign this here?

14       MR. MORAL:  Sure.

15       MR. MCCLINCH:  Okay.

16       MR. ANDERSON:  He can do that?

17       MR. MORAL:  Sure.

18       MR. ANDERSON:  All right.  I mean, I think we

19   do have a blue ink, but it's probably in the cabin.

20       MR. MORAL:  He's sitting in an office of the

21   United States trustee.  Sure.  If you sign it and

22   deliver it, they'll forward it to us.

23       MR. MCCLINCH:  Okay.  Good.  Can I use your

24   pen?

25       MR. ANDERSON:  All kind of new things happening

Page 31

1    in this case.  I've never done this, have you,

2    video?

3         MR. MORAL:  Not via video, no.  See, all I do

4    is 11s.  I don't do the 7s and the 13s, but they do

5    them all the time.

6         MR. ANDERSON:  They do?

7         MR. MORAL:  We do all of our Arustic [phonetic]

8    County.

9         MR. ANDERSON:  Arustic [phonetic] County goes

10   through video?

11        MR. MORAL:  Yeah, because our trustees are in

12   Portland.

13        MR. ANDERSON:  That makes sense.

14        MR. MORAL:  Okay.  While we're waiting -- have

15   you signed it?

16        MR. MCCLINCH:  He's getting a pen from his

17   paralegal.

18        MR. MORAL:  While we wait for him, I'm now on

19   form 107, which is the statement of financial

20   affairs.

21        MR. MCCLINCH:  Yes, okay, got it.

22        MR. MORAL:  All right.  If you will just flip

23   through the questions and the answers on form 107.

24   I see that you've got a couple of lawsuits that you

25   disclose, one in Waldo County, Maine commenced by

Page 32

1       TPL Financial Services, and another by Bank of

2       America pending in the Connecticut Superior Court.

3       Is that the extent of the litigation that you're

4       involved in currently?

5              MR. MCCLINCH:  Yes.

6              MR. MORAL:  On question 16 of the form, on page

7       43 of 51, is a disclosure of money paid by you

8       within the last year in connection with bankruptcy

9       preparation.  Do you see that?

10             MR. MCCLINCH:  Yes.

11             MR. MORAL:  Is that the extent of the money

12      you've paid to Bernstein Shur in the last year?

13             MR. MCCLINCH:  I wish.  It shows $10,000, but

14      it's quite a bit more.

15             MR. MORAL:  How much more?

16             MR. ANDERSON:  The disclosure in the attorney

17      declaration.

18             MR. MORAL:  Is it all in there?

19             MR. MCCLINCH:  I think about -- Sam, $190,000?

20             MR. ANDERSON:  I think it's $101,000.

21             MR. MORAL:  Okay.

22             MR. ANDERSON:  I think this is wrong.

23             MR. MORAL:  Mr. Anderson tells me I should look

24      at the declaration that's pending in the -- I guess

25      it's been approved -- in the application.  So,

Page 33

1    that's fine.  Thank you.  Looking through the

2    balance of the questions and answers, we get to part

3    12, which is on page 47 of 51.  Have you signed that

4    yet?

5            MR. MCCLINCH:  Okay.  I'm looking for that.  I

6    would this that that's an electronic signature, and

7    I can sign it now.

8            MR. MORAL:  Yes, please.  Would you?

9            MR. MCCLINCH:  Yes.  Okay.  That's done.

10           MR. MORAL:  And please deliver it to

11   Mr. Griffith.

12           MR. MCCLINCH:  I will.

13           MR. MORAL:  Thank you.  Is the information

14   contained on this form, form 107, true, accurate,

15   and complete to the best of your knowledge?

16           MR. MCCLINCH:  To the best of my knowledge,

17   yes.

18           MR. MORAL:  I'm now looking at official form

19   122B, which is your statement of monthly income.

20           MR. MCCLINCH:  Yes.

21           MR. MORAL:  Is that information correct?

22           MR. MCCLINCH:  Yes, it is.  One section would

23   be my social security check.

24           MR. MORAL:  Yeah, that's not listed here, is

25   it?

Page 34

1          MR. MCCLINCH:  No.

2          MR. MORAL:  Would you arrange with your counsel

3     to amend that, and to sign it and send it in?

4          MR. MCCLINCH:  Yes, I will.

5          MR. MORAL:  Thank you.

6          MR. PRESCOTT:  Does it exclude social security?

7          MR. ANDERSON:  Under subpart eight?

8          MR. MORAL:  It might explicitly exclude it.

9          MR. ANDERSON:  I think it does.

10         MR. MORAL:  Okay.

11         MR. ANDERSON:  We don't need to amend it.

12         MR. MORAL:  All right.  So, the 2016 disclosure

13    is signed by you guys.  We don't need to go over

14    that in any further detail.  Okay.  Just a wrap up

15    question, Mr. McClinch, which is do you have any

16    reason to believe that you need to amend or change

17    the information that's reflected on the forms that

18    we just went through?

19         MR. MCCLINCH:  To the best of my knowledge, no.

20         MR. MORAL:  Okay.  So, we started to talk a

21    little bit about the offer to purchase the ranch,

22    and we've got the offering price.  We have the name

23    of the purchaser, although I'm not sure that I've

24    spelled it right.  Can you spell his last name?

25         MR. MCCLINCH:  Yes, S-H-U-E-T-T.

Page 35

1       MR. MORAL:  Shuett.

2       MR. MCCLINCH:  Yes.

3       MR. MORAL:  And where does Mr. Shuett live?

4       MR. MCCLINCH:  Billon, Montana, B-I-L-L-O-N.

5       MR. MORAL:  And the intention is to go on

6   record with a notice of sale pretty soon?

7       MR. ANDERSON:  We should be filing a motion to

8   approve a fairly expense reimbursement, and then

9   that has to be heard by the 14th under the P&S, and

10   expense reimbursement proceeding, and then after

11   that, we will file the sale motion, which has to be

12   heard under the agreement by the 21st of December.

13       MR. MORAL:  Okay.

14       MR. ANDERSON:  So, it will move pretty quickly.

15       MR. MORAL:  Yeah, all right.

16       MR. ANDERSON:  Closing is the 19th of January

17   or before, but we do hope that it closes in advance

18   of that.

19       MR. MORAL:  All right.  And is Mr. Shuett

20   represented?

21       MR. ANDERSON:  He is.

22       MR. MORAL:  Who?

23       MR. ANDERSON:  Malcolm Goodrich [phonetic], who

24   is a lawyer in Montana.

25       MR. MORAL:  Okay.  Do they have local counsel

Page 36

1    yet?

2         MR. ANDERSON:  So, they don't need local

3    counsel.  We might need local counsel.

4         MR. MORAL:  In Montana?

5         MR. ANDERSON:  In Montana, yeah.  So, we intend

6    to build that fairly modest retention into the sale

7    motion and see if we can get approved on that basis.

8    So, we have a name, in fact, Body [phonetic] is

9    local counsel for Ben Cory [phonetic] who is counsel

10   for First Interstate Bank, he is the one who

11   recommended the counsel that we use on the seller

12   side in Montana.

13        MR. MORAL:  Okay.  All right.  Good.  Well,

14   we'll be talking about that, right.  We'll just go

15   over the details as soon as we can.

16        MR. ANDERSON:  Yeah.

17        MR. MORAL:  And maybe, Sam, you can talk about

18   this, I'm just curious, what does 5.129 get us?

19        MR. ANDERSON:  I think it pays off all of the

20   secured debt on the ranch, and I don't believe there

21   are really any unsecured claimed in the Circle 9

22   case.  And when it pays off the secured debt on the

23   ranch, you have to be mindful that a lot of that

24   debt also rests in other places.

25        MR. MORAL:  Right.

Page 37

1        MR. ANDERSON:  And I can get into the specifics

2   of that if you want, but.

3        MR. MORAL:  Not so much, but is there a surplus

4   that is going to be available to address some of

5   Mr. McClinch's personal liabilities.

6        MR. ANDERSON:  There will be a surplus.  I

7   don't think -- it will be modest I think.  And I

8   haven't quite figured out what to do with the

9   surplus, but I think what we may do is just transfer

10  it over to the individual case as opposed to keeping

11  it locked up in Circle 9, but I haven't thought that

12  fully through.

13       MR. MORAL:  Okay.  Is there a surplus above and

14  beyond what's necessary to clear Mr. McClinch's

15  personal liabilities?

16       MR. ANDERSON:  No because -- so, for instance,

17  Bank of America has a line of credit for $1,000,000,

18  primarily secured by the house in Connecticut,

19  right.  So, there would be enough money to clean up

20  that.  And then Mr. Lawnsky [phonetic] has a

21  mortgage on the Booth Bay house that was seller

22  financing, so there would be enough to clean up that

23  either.  Those are secured claims.

24       MR. MORAL:  So, we're going to needs to deal

25  with those properties another way.

Page 38

1      MR. ANDERSON:  That's right.  So, for instance,

2      the Booth Bay house is for sale.

3      MR. MORAL:  Yeah.

4      MR. ANDERSON:  So, if the Booth Bay house

5      sells, you know, provided the price is right, which

6      I think should be more than enough to pay off

7      Lawnsky [phonetic], then that debt will go away, and

8      then we're left with really just Bank of America,

9      secured by the house in Connecticut.  And I mean,

10     there's no secret to this.  If the Thorp Street deal

11     comes to fruition, that clears the decks and then

12     some.

13     MR. MORAL:  Okay.  So, that's really the --

14     MR. ANDERSON:  I think you could actually do it

15     without that.  So, right now, the only thing that's

16     not for sale is the house in Connecticut, and we can

17     get into reasons as to why.  It may ultimately go up

18     for sale, but that's the only property that's not.

19     Even if you sell everything else, but don't sell the

20     house in Connecticut, I think you're pretty close to

21     cleaning up everything, even without Thorp Street,

22     and even without the equity in the Connecticut

23     house.  Not quite, but I think you're pretty close,

24     depending on what things sell for.

25     MR. MORAL:  I guess we haven't talked about the

Case 18-10568   Doc 198-1   Filed 04/02/21   Entered 04/02/21 15:16:48   Desc Exhibit
Ex. A - Creditors Mtg Transcript   Page 39 of 91

Page 39

1    Connecticut house itself.  Who owns that?

2         MR. ANDERSON:  It's co-owned by Nancy McClinch

3    and Terry McClinch.

4         MR. MORAL:  Okay.  Is that where Nancy McClinch

5    resides?

6         MR. ANDERSON:  Yes.

7         MR. MORAL:  She's not in Montana?

8         MR. ANDERSON:  She's not in Montana.

9         MR. MORAL:  Okay.  And, Mr. McClinch, you have

10   a co-ownership interest in the house in Connecticut,

11   right?

12        MR. MCCLINCH:  Yes, I do.

13        MR. MORAL:  And that's where your wife

14   resides --

15        MR. MCCLINCH:  Yes.

16        MR. MORAL:  -- currently?

17        MR. MCCLINCH:  Correct.

18        MR. MORAL:  All right.  Well, I think I've got

19   sort of a 10,000 foot view.  That's very helpful.

20   We'll see who wants to follow up with details.

21        MR. ANDERSON:  Yeah.

22        MR. MORAL:  I guess this is a good time to open

23   the floor up to any creditors in the McClinch

24   Chapter 11 case to ask any follow up questions of

25   Mr. McClinch.  Mr. Moore?

Case 18-10568   Doc 198-1   Filed 04/02/21   Entered 04/02/21 15:16:48   Desc Exhibit
Ex. A - Creditors Mtg Transcript   Page 40 of 91

Page 40

1            MR. MOORE:  Hello, Terry.

2            MR. MCCLINCH:  Marty.

3            MR. MOORE:  I guess the only thing I'm looking

4       for is to get paid for what I did up to the point

5       that you stopped the project after Katherine's

6       death.  And I brought drawings down and

7       specifications that I prepared at that time for your

8       attorney to look at, if he wishes to look at it, and

9       I filed the proof of claim in the court at the last

10      meeting.  And so, I think what your attorney needs

11      to know that you approve my claim, and the rest of

12      it is, you know, pretty complex for me.  I'm trying

13      to understand, but that's all I'm really after is

14      just get paid for what I did.  We had a great track

15      record doing projects together and sailing together,

16      and that's here nor there, but I would like to hear

17      you approve my claim so that I'm on the list to get

18      paid.  That's all I ask.

19           MR. MORAL:  You are on the list.  There's no

20      dispute listed on schedules that I recall seeing.

21      So, it's undisputed, which is significant in the

22      sense that probably before the case is over, there

23      will be a notice that you file a proof of claim

24      within a certain period of time.  Did I hear you say

25      you've already filed a proof of claim?

Veritext Legal Solutions

800-726-7007                                              305-376-8800

Page 41

1       MR. MOORE:  I did, yes.  If you'd like to see

2   that document, I have that.

3       MR. MORAL:  You know what, I think the thing to

4   do is to work directly with Mr. Anderson's firm if a

5   question comes up.

6       MR. MOORE:  That's on file in the courthouse,

7   you'll have access to that.

8       MR. ANDERSON:  We do have access to that.  We

9   did mark it as disputed.

10      MR. MORAL:  You did?

11      MR. ANDERSON:  Yes, but I don't -- the best

12  thing is you and I -- there is a whole claims

13  process that's embedded within the bankruptcy

14  process.  So, feel free, as you have in the past, to

15  just call me and we can discuss things further.

16      MR. MOORE:  How does Terry feel?  What is your

17  take on this, Terry?

18      MR. MCCLINCH:  Well, you know, I don't dispute

19  that you did the drawings.  I think, you know, the

20  last portion of the drawings, I never even reviewed,

21  you know, because Katherine's death, and you know,

22  that changed everything.

23      MR. MOORE:  I'm sorry, I can't hear you.

24      MR. MCCLINCH:  I say I never, you know, I don't

25  dispute that you did the work.  The last portion of

Page 42

1      the project I did not review.  I never even looked

2      at the drawings, and obviously, when Katherine died,

3      you know, everything changed.

4           MR. MOORE:  Right.

5           MR. MCCLINCH:  And I decided not to do the

6      project.

7           MR. MOORE:  I did the drawings and the

8      information that I signed on for was completed.  I

9      sent you a set of plans, which in an email, you said

10     that you didn't have them, and I offer today send

11     another set, which I have today in my possession

12     now.  So, I'll give that to your attorney, that's

13     not a problem.  And I only billed you for what I

14     did, not what the next phase was, and the phases are

15     preliminary drawings, construction drawings.  I

16     finished the preliminary drawings as per the

17     contract.  The construction drawings were not

18     started, or not done simply because there was no

19     reason to because the project was not going to move

20     forward.

21          MR. MCCLINCH:  Right.

22          MR. MOORE:  So, yeah, there is in line the

23     documents and documentation that I'll give your

24     attorney is not an issue.  It's on file and I can

25     leave the drawings today if you want, and I'll walk

Page 43

1    you through them, if you'd like.

2         MR. MCCLINCH:  Okay.

3         MR. MOORE:  Maybe you want to do it now?  It's

4    up to you folks.  I mean, my thing is a small thing,

5    but it's an important one to us because we have

6    bills to pay just like everyone else.

7         MR. MORAL:  Right.  Mr. Moore --

8         MR. MOORE:  Yes, sir.

9         MR. MORAL:  -- I think that resolving the

10   details of your claim, and probably mostly important

11   to you is what you can expect to be paid and when,

12   are things that you can work out directly with them,

13   and I'm not sure that Mr. McClinch has anything

14   really to add or that has a significant impact on

15   those issues.  So, if you're okay, I think probably

16   the rest of the work that needs to be done should be

17   done, you know, off this hearing, offline, and --

18        MR. MOORE:  Terry, is that something you stand

19   by?

20        MR. MCCLINCH:  I think, you know, at this

21   point, probably best to deal with Sam and, you know,

22   try and resolve it.

23        MR. MOORE:  Okay.

24        MR. MORAL:  Does anybody else, any other

25   creditor wish to examine Mr. McClinch?

Page 44

1          MR. MOORE:  Thank you, Terry.

2          MS. CALDWELL [phonetic]:  I have some questions

3     for Mr. McClinch.

4          MR. MORAL:  Sure.  Go ahead.

5          MS. CALDWELL [phonetic]:  Hi, Mr. McClinch.  My

6     name is Bodi Caldwell [phonetic].  I represent --

7          MR. MORAL:  Bodi [phonetic], you may want to

8     sit here so that the microphone picks you up.

9          MS. CALDWELL [phonetic]:  Sure.  You don't like

10    me yelling across the room?  I represent First

11    Interstate Bank.  How are you this afternoon?

12         MR. MCCLINCH:  Good.  How are you?

13         MS. CALDWELL [phonetic]:  Good.  I have a

14    couple questions relating to the mortgage and the

15    promissory note with First Interstate Bank, if

16    that's okay?

17         MR. MCCLINCH:  Sure.

18         MS. CALDWELL [phonetic]:  Specifically, on your

19    schedules you didn't indicate that you're disputing

20    the personal guarantee.  Do you, in any way, dispute

21    the personal guarantee for First Interstate Bank?  I

22    believe it was dated December 23, 2013.

23         MR. MCCLINCH:  I don't dispute that at all, no.

24         MS. CALDWELL [phonetic]:  And, do you believe

25    that that personal guarantee is contingent on

Page 45

1   anything?  Would it be classified as a contingent

2   claim in this case?

3       MR. MCCLINCH:  I don't quite understand the

4   question.

5       MS. CALDWELL [phonetic]:  Sure.  That's okay.

6   You haven't it indicated it's contingent on your

7   schedule, so I'm assuming you don't think it is.  Do

8   you dispute the amount that's due under the

9   promissory note and guaranteed by you personally?

10  As of today, First Interstate believes it is

11  $1,981,578.02, not including collection costs.

12      MR. ANDERSON:  Just for the record, there's no

13  way he knows the answer to that question.  The debt

14  will be driven by what the loan documents provide,

15  right?

16      MS. CALDWELL [phonetic]:  Fair enough.

17      MR. ANDERSON:  And the same applies to the

18  guarantee.

19      MS. CALDWELL [phonetic]:  Yeah.

20      MR. ANDERSON:  The guarantee says what it says.

21  If he guaranteed the debt, he did.  If we need to

22  amend the schedules because he didn't, then we would

23  do that.  But, I don't believe that there's any

24  issue with the guarantee, all rights reserved.

25      MS. CALDWELL [phonetic]:  Then, that's the end

Page 46

1      of my questions.

2            MR. ANDERSON:  Great.

3            MS. CALDWELL [phonetic]:  Thank you.

4            MR. MORAL:  Anybody else?

5            MR. SMART:  Hi, Mr. McClinch.  My name is Mika

6      Smart.  I represent Joe and Madeline Lawnsky

7      [phonetic].  Just a couple quick questions.  So,

8      earlier this year, in June, you took a loan out from

9      Coastal Realty Capital in a little bit more than

10     $1,000,000 that included a mortgage on the Booth Bay

11     property; is that right?

12           MR. MCCLINCH:  That's correct.

13           MR. SMART:  What happened to those funds?

14           MR. ANDERSON:  Well, let's stop there for a

15     second because the loan wasn't really for $1,000,000

16     at that point in time.  It was an advance of

17     $100,000 over what had already been advanced in

18     November of '16.

19           MR. MORAL:  So, is your question what happened

20     to the loan proceeds?

21           MR. SMART:  Yes.

22           MR. ANDERSON:  From November of '16?

23           MR. SMART:  I mean, I guess let's start with

24     the $100,000 in June.

25           MR. MCCLINCH:  Okay.  That was used for moving

Page 47

1    expenses, supporting the ranch, you know, again, I

2    would say there's copies of every check that had

3    been written.  And, Sam, is he entitled to review

4    that?

5         MR. ANDERSON:  I mean, if you want to go

6    through a formal process, you know, we can produce

7    anything that we can agree to produce?

8         MR. SMART:  Would most of that be in the MOR?

9         MR. ANDERSON:  Most of that would not be in the

10   MOR because it's all pre-petition.  I don't know if

11   every cent of that loan was spent pre-petition.

12   Some of it could have been embedded within the

13   balance that were carried into the 11.

14        MR. SMART:  Right.  So, on page 40 of that

15   document we are looking at, official form 107, part

16   one, you mention that you previously resided in

17   Fairfield, Connecticut, but didn't provide dates.

18   Could you provide dates?

19        MR. MCCLINCH:  For what year?

20        MR. SMART:  Yes, and month.

21        MR. MCCLINCH:  What year do you want?

22        MR. SMART:  I want to know what years in the

23   past three years, and preferably months as well, you

24   resided in Fairfield, Connecticut.

25        MR. MCCLINCH:  You know, I can't answer that.

Page 48

1      MR. MORAL:  When did you buy the property,

2   Mr. McClinch?

3      MR. MCCLINCH:  I think it was 2015.

4      MR. MORAL:  2015, is that what he said?

5      MR. MCCLINCH:  I think so.

6      MR. MORAL:  Okay.  So, three/four years ago.

7   Did your wife contribute to the purchase price?

8      MR. MCCLINCH:  I'm sorry?

9      MR. MORAL:  Did your wife contribute to the

10   purchase price?

11      MR. MCCLINCH:  No.

12      MR. MORAL:  Has she lived there consistently

13   since 2015?

14      MR. MCCLINCH:  Now, we're talking about the

15   house in Maine?

16      MR. MORAL:  No.  We're talking about the

17   property in Fairfield, Connecticut.

18      MR. MCCLINCH:  She lives there, but she was

19   also spending some time in Maine.

20      MR. SMART:  Sure, like a lot of people do.

21      MR. MCCLINCH:  Right.

22      MR. MORAL:  All right.  And how did it come to

23   pass that the title is in your wife's name?

24      MR. ANDERSON:  It's jointly owned.

25      MR. MORAL:  Is it jointly owned?

Page 49

1      MR. MCCLINCH:  Yeah.

2      MR. ANDERSON:  The house in Connecticut is

3  jointly owned by husband and wife, yes.

4      MR. MCCLINCH:  Did he purchase it prior to the

5  marriage?

6      MR. ANDERSON:  I don't think so, but when did

7  you buy Congra Street [phonetic]?  Was that 2015?  I

8  thought it was before that?

9      MR. MCCLINCH:  Yeah, probably maybe 2001.

10      MR. ANDERSON:  He was saying '15 to the main

11  house.  But, you would know, you were the seller,

12  that's probably about right.

13      MR. SMART:  Not me personally, unfortunately.

14      MR. ANDERSON:  Your client.

15      MR. MORAL:  Describe the house in Fairfield.

16      MR. MCCLINCH:  We bought -- it's 7.7 acres and

17  we built a home, you know, I think it was about

18  4,000 square feet.

19      MR. MORAL:  How many bedrooms?

20      MR. MCCLINCH:  Four bedrooms, large kitchen,

21  family room, living room.

22      MR. MORAL:  Do you have an opinion of its

23  value?

24      MR. MCCLINCH:  I would say in excess of

25  $2,000,000.

Page 50

1          MR. MORAL:  Is it currently listed for sale?

2          MR. MCCLINCH:  No.

3          MR. ANDERSON:  That's the only property that's

4     not listed for sale.

5          MR. MORAL:  Okay.  Do you need to know anything

6     else?

7          MR. SMART:  I mean, I'd still like to get some

8     sort of answer on that.  You did live in Fairfield

9     within the last three years?

10         MR. MCCLINCH:  Yes.

11         MR. SMART:  And when was the last time you

12    resided in the main property, in the Booth Bay

13    property?

14         MR. MCCLINCH:  I was there probably just about

15    a year ago.

16         MR. SMART:  And do you currently hold a Maine

17    license?

18         MR. MCCLINCH:  No.

19         MR. SMART:  Do you hold a Montana license?

20         MR. MCCLINCH:  Yes.

21         MR. SMART:  Okay.  That's all I have.

22         MR. MORAL:  Okay.  Would anybody else like to

23    examine Mr. McClinch?

24         MR. NORTON:  Mr. McClinch, my name is Tim

25    Norton.  I represent Coastal Realty.  Just a quick

1    question, and maybe you said this and I didn't hear

2    it, the Thorp Street property, I think you said if

3    the planning board approvals came through on

4    Thursday, your partner would be writing a check; is

5    that right?

6        MR. MCCLINCH:  Well, subject, you know, subject

7    to the approval and subject to him getting

8    financing.

9        MR. NORTON:  Yeah, it's subject to a lot of

10   things.  I didn't mean to suggest it's coming

11   through the day after.

12       MR. MCCLINCH:  Yeah.

13       MR. NORTON:  My question was, do you have any

14   idea what the amount of the check would be?

15       MR. MCCLINCH:  Not yet.  It's going to be

16   contingent upon, you know, what project they

17   approve.

18       MR. NORTON:  Any idea what the ballpark is?

19       MR. MCCLINCH:  $5,000,000 to $7,000,000.

20       MR. NORTON:  Thank you.  That's all I had.

21       MR. KRESSWELL [phonetic]:  Mr. McClinch, I

22   represent TPL Financial Services.  How are you?

23       MR. MCCLINCH:  Good.

24       MR. KRESSWELL [phonetic]:  So, do you recall,

25   in August of 2017, doing a settlement agreement with

Page 52

1    TPL Financial Services?

2         MR. MCCLINCH:  Yes.

3         MR. KRESSWELL [phonetic]:  And the amount of

4    that settlement agreement was $715,000, do you

5    recall that?

6         MR. MCCLINCH:  Well, initially, it was a -- I

7    wouldn't call it a line of credit --

8         MR. ANDERSON:  It was a factoring relationship.

9         MR. KRESSWELL [phonetic]:  Right.  I guess I'm

10   less -- and I'm sorry, I'm not trying to cut you

11   off, but I'm less concerned about what got us to the

12   settlement agreement, that that was the resolution

13   of the prior lending with the shipyard, correct?

14   The settlement agreement was?

15        MR. MCCLINCH:  Can you repeat the question?

16        MR. KRESSWELL [phonetic]:  Sure.  I'm sorry if

17   I didn't say that well.  In August of '17 you did a

18   settlement agreement with TPL Financial Services,

19   correct?

20        MR. MCCLINCH:  Sam?

21        MR. ANDERSON:  Yeah.  I mean, I don't have the

22   specific date, but that sounds about right, yeah.

23        MR. KRESSWELL [phonetic]:  And that was the

24   resolution of a factoring arrangement that relate to

25   the shipyard; is that right?

Page 53

1        MR. MCCLINCH:  Yes.

2        MR. ANDERSON:  Yes.

3        MR. KRESSWELL [phonetic]:  And out of that

4    settlement agreement, there was a promissory note of

5    $715,000 that was to be paid, interest only, on a

6    monthly basis plus some larger pay downs.  Do you

7    recall that?

8        MR. MCCLINCH:  Yes, I do.

9        MR. KRESSWELL [phonetic]:  And there was

10   $200,000 was paid on the note on those larger pay

11   downs.  Do you recall those things occurring?

12       MR. MCCLINCH:  I wasn't really involved in that

13   side of the project.  The president of the shipyard

14   handled that, Eric Graves [phonetic].

15       MR. KRESSWELL [phonetic]:  Okay.  Because the

16   reason I say that is your schedules list TPL as

17   having a claim of $515,000, so I'm just doing the

18   math, $715,000 minus $200,000 is $51,500,000.

19       MR. MCCLINCH:  Right.

20       MR. KRESSWELL [phonetic]:  But, did there come

21   of a time in the spring of 2018, this year, in which

22   the monthly interest only payments were stopped

23   being made?

24       MR. MCCLINCH:  Yes.

25       MR. KRESSWELL [phonetic]:  Okay.  And do you

Page 54

1    dispute, Mr. McClinch, that TPL Financial Services

2    has a mortgage position on the ranch?  Do you

3    dispute that?

4         MR. MCCLINCH:  No, I don't.

5         MR. ANDERSON:  And same reservation that I made

6    in relation to Ms. Caldwell [phonetic], I mean, the

7    documents provide what they provide, okay.  If he

8    says there's a mortgage on the ranch but there

9    isn't, then there isn't.

10        MR. KRESSWELL [phonetic]:  Okay.  Just asking.

11   Do you dispute whether there's a mortgage position

12   on the airport down in Connecticut, that's the

13   Candlelight entity that secures the debt to TPL

14   Financial Services?  You can answer it, and Sam has

15   his reservation.

16        MR. MCCLINCH:  Sam?

17        MR. ANDERSON:  We believe there's a mortgage

18   subject to me getting rid of it.

19        MR. KRESSWELL [phonetic]:  Okay.  Thank you,

20   Mr. McClinch.  That's all I got.

21        MR. MORAL:  Anybody else?  Okay.  Thanks.  I

22   have a couple of just -- well, let me ask the

23   questions.  You schedule a horse, right?

24        MR. MCCLINCH:  Yes.

25        MR. MORAL:  What kind of horse is it?

Page 55

1          MR. MCCLINCH:  It's a border horse, probably 18
2     years old.
3          MR. MORAL:  How old, a border horse, what is
4     their life expectancy?
5          MR. MCCLINCH:  I would say rookies, probably
6     getting close to the end of that, 22 years probably.
7          MR. MORAL:  Does the horse compete in any kind
8     of shows or competitions?
9          MR. MCCLINCH:  No, not at all, no.
10         MR. MORAL:  Okay.  You also schedule a
11    sailboat.
12         MR. MCCLINCH:  Yes.
13         MR. MORAL:  What's the basis of a $30,000
14    estimate for a 43 foot --
15         UNIDENTIFIED SPEAKER:  It's wood.
16         MR. MORAL:  What's the basis for your value?
17         MR. MCCLINCH:  Well, the charge to sell it at
18    $38,000, a number of people to look at it -- I
19    actually suggested we just auction the boat off a
20    few months ago, but I've never heard.  The gentleman
21    who owns the shipyard, Alec Brenner [phonetic], had
22    someone from Europe that he thought could be a
23    strong buyer, however it's never produced an offer.
24    And I still maintain the best thing to do is just
25    auction the boat off and get it behind us.

Page 56

1           MR. MORAL:  Is it listed for sale?

2           MR. MCCLINCH:  It is.

3           MR. MORAL:  And who is the party that's got the

4     listing?

5           MR. MCCLINCH:  Artisan Boat Works in Dockport,

6     Maine.

7           MR. MORAL:  How long since the boat's been in

8     the water?

9           MR. MCCLINCH:  Now, I would say a year and a

10    half.  The boat has to go back in the water in the

11    string, you know, really --

12          MR. MORAL:  Has it been surveyed?

13          MR. MCCLINCH:  There has not been a recent

14    survey?

15          MR. MORAL:  When was the last survey?

16          MR. MCCLINCH:  Three years ago.

17          MR. MORAL:  And what was the value of it?

18          MR. MCCLINCH:  I believe it was about $40,000.

19          MR. MORAL:  All right.  Thanks.  Unless anybody

20    has any further questions, I'm going to continue --

21    I'm going to terminate the 341 meeting after I make

22    my little speech.  Mr. McClinch, the price of being

23    in Chapter 11 includes the requirement that you file

24    on a timely basis a statement of your monthly income

25    and.all your expenses, it includes the basic

Page 57

1    responsibility to manage your estate, at the very

2    minimum so that creditors are not harmed by the

3    duration of the Chapter 11 case, and it also depends

4    upon your timely payment of what I refer to as

5    quarterly fees, which are fees charged to every

6    Chapter 11 debtor, which funds not only the United

7    States trustee program, but to a certain extent, the

8    court budgets.  So, it's an important

9    responsibility, and one that my office is charged

10   with enforcing.  So, I wanted to reaffirm what I

11   think you've already been told, which is those are

12   things that have to be done, not only completely and

13   accurately, but on a timely basis, and I just want

14   to reaffirm the importance of that.  The other thing

15   that I want to nail down, because I gather there

16   some open issues with respect to it, which is the

17   closing of pre-petition bank accounts and the

18   opening of new bank accounts.  So, I have a follow

19   up question to that comment, which is are there any

20   bank accounts that were open on the day of the

21   bankruptcy that are not closed yet?

22        MR. MCCLINCH:  No.

23        MR. MORAL:  They're all closed?

24        MR. MCCLINCH:  There's two accounts, Chase Bank

25   and Stockman Bank.

1      MR. MORAL:  Yeah.  Are those accounts --

2      MR. MCCLINCH:  They have not been closed yet.

3      MR. ANDERSON:  So, you know, and we've worked

4   with Amy Gudreaux [phonetic] a fair amount, getting

5   the dip accounts opened was exceedingly difficult

6   based on his location and inability to be physically

7   present at banks.  We did, just late last week, open

8   up the three dip accounts with, I'm going to

9   pronounce this wrong, but Axos [phonetic] is the

10  pronunciation, so the dip accounts are opened, and

11  now they just have to be the money transferred.

12  There is one residual issue, which is the social

13  security check goes into, I think the Chase account,

14  and he's obviously pretty concerned that --

15     MR. MORAL:  An automatic basis?

16     MR. ANDERSON:  Yeah, so.

17     MR. MORAL:  Okay.  What's the timing on that?

18     MR. ANDERSON:  The timing on the transfer of

19  the -- I don't quite know how that works.  Shawn

20  Baker of my office has been working with Terry to

21  kind of get that whole process --

22     MR. MORAL:  So, it's currently underway?

23     MR. ANDERSON:  Currently underway, yeah.

24     MR. MORAL:  Okay.

25     MR. MCCLINCH:  Sam, I might add that, you know,

Page 59

1    I may have to go to the social security office in

2    Montana, you know, to modify this.  So, you know,

3    I'm not sure the process.

4        MR. MORAL:  Is that the only hang up, social

5    security?

6        MR. ANDERSON:  That's the only hang up of

7    transferring the funds from the Stockman account and

8    the Chase account to the Axos [phonetic] account for

9    him.  The other two accounts are going to be

10   modestly funded from transfers from an account at

11   Thorp Street.  So, Thorp Street --

12       MR. MCCLINCH:  Now, I would also add, the Chase

13   account, I'm on auto pay for oil.

14       MR. ANDERSON:  There you go.  So, that's

15   reoccurring, so that's got to be switched out too.

16       MR. MCCLINCH:  So, I have a number of auto pays

17   that goes through the Chase account.

18       MR. ANDERSON:  But, those are easy to switch

19   now that we have the Axos [phonetic] account opened.

20   The only big one is social security.

21       MR. MORAL:  Have you filed the initial monthly

22   operating report?

23       MR. ANDERSON:  The initial for the stub period,

24   yes.

25       MR. MORAL:  So, that disbursements out of those

Page 60

1    accounts -- did you file the bank statements with

2    the monthly operating report?

3         MR. ANDERSON:  Yes.

4         MR. MORAL:  So, any disbursements post-petition

5    should show up on those bank statements, right?

6         MR. ANDERSON:  Anything will show up on the

7    bank statements, but keep in mind, we've only filed

8    the stub period, so we're behind, but yes, anything

9    will show up, yeah.

10        MR. MORAL:  Yeah, okay.

11        MR. ANDERSON:  And that's why we were looking

12   to hire Spinglass [phonetic], who is fully up to

13   speed on Mr. McClinch's affairs because he could

14   help us with this stuff.

15        MR. MORAL:  And we're all giving you a hard

16   time of this.

17        MR. ANDERSON:  I know.

18        MR. PRESCOTT:  And we are working to finalize

19   October.  We recently received the bank statement so

20   that we can put it together.

21        MR. MORAL:  Okay.

22        MR. PRESCOTT:  It's close.

23        MR. MORAL:  But, he needs his social security

24   income just to get along, right, buy groceries?

25        MR. ANDERSON:  Yes.

Page 61

1        MR. MORAL:  All right.

2        MR. ANDERSON:  That's the problem, right, is

3    you don't want to close the account and then it gets

4    lost in social security, you know, nowhere.

5        MR. MORAL:  And that's his only source of

6    income, right?

7        MR. ANDERSON:  That's his only source of

8    income, other than for instance, he had some cash in

9    the bank when he filed, right, some of which was

10   probably proceeds of that loan that was done with

11   Mr. Norton's client this past summer.  I mean, I

12   don't know fully what makes up, but he has been, in

13   part, living off the social security and then the

14   money that existed at the time of filing.

15       MR. MORAL:  Yeah, okay, let's --

16       MR. GRIFFITH:  Mr. Sam?  Mr. Sam?  I don't know

17   your last name, so.

18       MR. ANDERSON:  Yeah.

19       MR. GRIFFITH:  Can he go into the social

20   security office here in Arizona?  He doesn't have to

21   go all the way back to Montana?

22       MR. ANDERSON:  That could very well be the

23   case.  I have no idea how that works, but I wouldn't

24   think that you'd have to go back to Montana for

25   that, but I don't know.

Page 62

1          MR. GRIFFITH:  Okay.

2          MR. MORAL:  Let's have this understanding, that

3     you're going to make progress, regularly, to get

4     this done.  If the only money we're really talking

5     about is his social security income, and he uses

6     that to pay groceries, and not for some other

7     purpose, like a the cattle ranch expenses, we can

8     live with that as long as we have the details in the

9     interim.  In other words, we want to be able to

10    recreate what he's doing in terms of taking money

11    and disbursing money so that if someone asked a

12    question, we could answer the question easily by

13    referring to the monthly operating reports.  And

14    let's just have a gentleman's agreement that you're

15    going to get it done just as soon as the social

16    security administration will let you, okay?

17         MR. ANDERSON:  It's been a lot of hard work on

18    Shawn's part to get the accounts set up, and once we

19    have them set up, that's when the transition can

20    start to take place, but yeah.

21         MR. MORAL:  And I have empathy for the issue,

22    but that's the kind of stuff that results in a

23    motion to convert the case to Chapter 7, which could

24    very well be where we're headed anyway.  So, the

25    sooner you can demonstrate that you have the ability

1    to do this on your own, the better, okay?

2        MR. MCCLINCH:   I'm sorry, the comment about

3    where we're heading anyway, what was that?

4        MR. MORAL:   Well, there's a live issue in this

5    case, I think you know, whether you're more

6    appropriate, instead of being a Chapter 11 debtor in

7    possession in charge of your own finances, or

8    whether it would be more fair to creditors if an

9    independent entity, like a Chapter 7 trustee, was in

10   charge of the liquidation of your estate.  And the

11   central issue, in my mind, in this case is whether

12   you can comply with the requirements that your old

13   bank accounts are closed and your new bank accounts

14   are open, and that you can account for every penny

15   that's earned and spent.  And right now, you're

16   short of the mark.  So, what I've tried to

17   communicate with your counsel is that there's a

18   certain amount of patience we can employ as long as

19   we can recreate your finances in the interim, but

20   that isn't a forever kind of thing.  We understand

21   that there may be some logistics associated with the

22   social security administration, and your attorneys

23   have agreed with me that they will do everything

24   they can to expedite that.  So, we have a window

25   that is narrowing on the extent to which we can

Page 64

1    exercise our discretion and hold back from

2    requesting that a Chapter 7 trustee be appointed.

3    That's the point I'm trying to make.

4         MR. MCCLINCH:  Okay.

5         MR. MORAL:  All right.  Where do we stand with

6    insurances?

7         MR. ANDERSON:  I think we're good.

8         MR. MORAL:  Is Amy happy?

9         UNIDENTIFIED SPEAKER 1:  I haven't heard from

10   her.

11        UNIDENTIFIED SPEAKER 2:  Yes.

12        MR. MORAL:  All your insurances are current?

13        MR. MCCLINCH:  Yes.

14        MR. MORAL:  Then, I'll leave it to Amy to keep

15   me posted on that.  And once again, unless there are

16   follow up questions, I will terminate this meeting,

17   and we'll try to move as expeditiously through the

18   Circle 9 and Candlelight cases, okay.  So, if you're

19   just here for the Terrance McClinch case, we're not

20   going to do anymore business on that case, and we'll

21   proceed to the other Chapter 11 cases, corporate

22   cases I should say, okay?  Thanks, Mr. Moore.  Now,

23   the good news is, Mr. McClinch, is that I don't have

24   to repeat all my lecturing to you in the corporate

25   cases.  They'll just simply stand.  I don't intend

Page 65

1    to belabor them, but I would like to proceed with

2    the Circle 9 Cattle case, and I'm going to try to do

3    this, once again, as quickly as I can.  Do you have

4    the Circle 9 Company, LLC schedules of assets and

5    liabilities?

6        MR. MCCLINCH:  I'm looking right now.

7        MR. MORAL:  And there was also a separate

8    petition that I know is -- I think it's here.  I've

9    done too many of these today, believe it or not, I

10   can't remember one case from the other.

11       MR. MCCLINCH:  Okay.  I have them in front of

12   me.

13       MR. MORAL:  All right.  Taking a look, as we

14   did last time, at your summary of assets, your list

15   of assets.  My first question is, is the list of

16   assets on this Circle 9 Cattle Company case, which

17   is again, for the record, 18-10569, is your list of

18   assets true, and complete, and accurate to the best

19   of your knowledge?

20       MR. MCCLINCH:  I'm reviewing it right now.

21       MR. MORAL:  Thank you.

22       MR. MCCLINCH:  Yes, it is accurate.

23       MR. MORAL:  And when we turn the page to your

24   liabilities, is that true, accurate, and complete to

25   the best of your knowledge?

Page 66

1          MR. MCCLINCH:  What page would that be?

2          MR. MORAL:  We would begin with form 206D,

3     which is page nine of 26.

4          MR. MCCLINCH:  Okay.

5          MR. MORAL:  And we go to page ten, page 11,

6     when we get to page 12, we're looking at your

7     unsecured claims.

8          MR. MCCLINCH:  Yes.

9          MR. MORAL:  Page 13 is your list of executory

10    contracts, which lists Dr. Shuett, among other

11    things.  Page 14 has your list of co-debtors.

12         MR. MCCLINCH:  Okay.

13         MR. MORAL:  Is the information on those

14    schedules of assets true, accurate, and complete to

15    the best of your knowledge?

16         MR. MCCLINCH:  Yes.

17         MR. GRIFFITH:  Excuse me, I have a question for

18    you.

19         MR. MORAL:  Sure.

20         MR. GRIFFITH:  How long is this going to take

21    because there's a 1:00 deposition, and I only have

22    the room for two hours.

23         MR. MORAL:  Okay.  What you're saying is I've

24    got 20 minutes?

25         MR. GRIFFITH:  Yes.

1    MR. MORAL:  We will be done within 20 minutes.

2    MR. GRIFFITH:  Okay, thanks.

3    MR. MORAL:  Thank you.  If you go to the

4    beginning part of this material, there is, on page

5    two of 26 the declaration under penalty of perjury,

6    which basically asks the signor to vouch for the

7    accuracy of all the schedules.  Have you signed that

8    document?  Page two of 26.

9    MR. MCCLINCH:  I'm having difficulty finding

10   it.  I'm still looking.

11   MR. MORAL:  Okay.  If it helps, we're now on

12   Circle 9.

13   MR. MCCLINCH:  Yeah, okay.  I just need to take

14   a moment to take some medicine.  Okay.  I think it

15   was an electronic signature.

16   MR. MORAL:  Okay.  So, if you don't mind, if

17   you can sign it and deliver it to --

18   MR. MCCLINCH:  Sure.

19   MR. MORAL:  -- Mr. Griffith, that would be

20   great.

21   MR. MCCLINCH:  Okay.

22   MR. MORAL:  And I apologize for jumping around.

23   I've already asked you about the accuracy of your

24   assets and liabilities.  I want you to refer to

25   official form 207, which is part of your package and

Page 68

1    begins on page 16, that's the list that includes

2    details about your financial history as it pertains

3    to the ranch, and there is a signature page vouching

4    for the accuracy of that information on page 22 of

5    26.  So, my pending question is for you, as you get

6    there, is is the information true, accurate, and

7    complete?  And if there's a signature there that you

8    haven't signed with an ink pen, would you please do

9    so and deliver it to Mr. Griffith?

10        MR. MCCLINCH:  It must be an electronic

11   signature.

12        MR. MORAL:  Okay.  So, please sign it.

13        MR. MCCLINCH:  Okay.

14        MR. MORAL:  And is that information that you

15   just looked at true, accurate, and complete to the

16   best of your knowledge?

17        MR. MCCLINCH:  Yes.

18        MR. MORAL:  Okay.

19        UNIDENTIFIED SPEAKER:  Now, I was just talking

20   to my attorney.  Between the one page before and

21   this one, was there any other signatures?

22        MR. MORAL:  They have signatures --

23        UNIDENTIFIED SPEAKER:  If you had him sign just

24   a couple minutes ago one page, and now you're having

25   him sign another one, was there anything from --

Page 69

1          MR. MORAL:  No, just the signature pages.

2          UNIDENTIFIED SPEAKER:  Okay.

3          MR. MORAL:  Thanks.  Okay.  Are there any

4    creditors who would like to inquire of Mr. McClinch

5    with respect to Circle 9?  Same admonition about the

6    financial accounting, I'm going to terminate the

7    meeting, and we'll proceed to Candlelight Farm

8    Aviation.

9          MR. MCCLINCH:  Okay.  I have it in front of me.

10         MR. MORAL:  Page two of that document is a

11   declaration under penalty of perjury pertaining to

12   Candlelight Farms Aviation.

13         MR. MCCLINCH:  Okay.

14         MR. MORAL:  Does that have a signature?

15         MR. MCCLINCH:  I'll sign it now.

16         MR. MORAL:  Please.

17         MR. MCCLINCH:  Okay.  Done.

18         MR. MORAL:  And my question is, is the

19   information contained on the statement of assets and

20   liability, and on the statement of financial affairs

21   as they pertain to Candlelight Farms Aviation, case

22   number 18-10579 true, accurate, and complete to the

23   best of your knowledge?

24         MR. MCCLINCH:  Yes, it is.

25         MR. MORAL:  And I believe with respect to

1    Candlelight, I don't have it in front of me, but I

2    guess I can ask Sam this just as easily as I can ask

3    you, the action authorizing the filing, I assume is

4    part of the petition and appended to the petition,

5    and is on the docket?

6         MR. ANDERSON:  I believe that's the case, yes.

7         MR. MORAL:  Okay.  And he basically had

8    meetings with respect to both Candlelight and Circle

9    9 as the sole member authorized to file?

10        MR. ANDERSON:  That's right.

11        MR. MORAL:  And you guys orchestrated that?

12        MR. ANDERSON:  We did.

13        MR. MORAL:  So, it must be right.

14        MR. ANDERSON:  It's right here.

15        MR. MORAL:  Great.  Are there any creditors who

16   would like to inquire of the debtor with respect to

17   Candlelight Aviation?  Same rules that I've outlined

18   for you as a Chapter 11 debtor pertain to both

19   Candlelight and Circle 9 equally, and I ask that you

20   be mindful of that.  If you have any questions or

21   concerns, I want you to please feel free to inquire

22   of our office, either directly or through your

23   counsel, and we can get things resolved so that we

24   can bring these cases to a satisfactory conclusion

25   as soon as possible.  With that, I wish you good

Page 71

1   luck.  Thank you.

2       MR. MCCLINCH:  Well, I'd like to apologize to

3   everyone.  I never, in a million years, would have

4   guessed that I would be in this situation, and you

5   know, it's humbling, and embarrassing, and I want to

6   get this resolved.

7       MR. MORAL:  We appreciate that, and we'll do

8   everything we can to help you.

9       MR. MCCLINCH:  Thank you.

10      MR. MORAL:  Thanks.  Meeting's adjourned.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 72

CERTIFICATE OF TRANSCRIPTIONIST

STATE OF FLORIDA:

COUNTY OF OSCEOLA:


I, ROBIN TRUDEAU, Court Reporter and Notary Public, State of Florida, certify that I was authorized to and did transcribe the audio that was provided to me and that the foregoing pages 2 through 71, inclusive, are a true and complete record of said audio to the best of my ability.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.


DATED this 9th day of June, 2020.


ROBIN TRUDEAU, FPR

[& - add]

| & | | | |
|---|---|---|---|
| **&** 3:4 | | | |

**18** 24:15 26:5 55:1
**18-10568** 2:7
**18-10569** 2:9 65:17
**18-10579** 2:10 69:22
**185** 11:10,15,16,18 12:7,17 13:5,17 27:6
**190,000** 32:19
**19th** 35:16
**1:00** 2:4 66:21

**33** 27:9
**341** 1:1 56:21
**35,000** 8:12
**35,965.81** 9:3
**37** 28:10
**38,000** 55:18
**39** 29:4

| 9 |
|---|

**9** 2:9 20:4,14,19 21:12 27:7 36:21 37:11 64:18 65:2,4 65:16 67:12 69:5 70:9,19
**90/10** 13:6
**95,000** 23:3
**995,000** 23:2
**9th** 72:18

| 0 |
|---|

**04** 17:2,3

| 2 |
|---|

**2** 64:11 72:9
**2,000,000** 49:25
**20** 26:17 66:24 67:1
**200** 19:14
**200,000** 53:10,18
**2001** 49:9
**2013** 44:22
**2015** 48:3,4,13 49:7
**2016** 34:12
**2017** 16:12 17:4 51:25
**2018** 1:2 2:3 7:9 53:21
**2020** 72:18
**206d** 66:2
**207** 67:25
**21st** 35:12
**22** 55:6 68:4
**22824** 72:21
**23** 44:22
**26** 66:3 67:5,8 68:5
**27** 7:9
**29** 16:12

| 4 |
|---|

**4** 1:2 2:3
**4,000** 49:18
**40** 47:14
**40,000** 56:18
**43** 32:7 55:14
**47** 33:3

| 1 |
|---|

**1** 64:9
**1,000,000** 37:17 46:10,15
**1,981,578.02** 45:11
**10,000** 32:13 39:19
**100** 12:8 23:19
**100,000** 46:17,24
**101,000** 32:20
**106c** 22:16,22
**106d** 25:13 26:7 29:5
**106dec** 28:23
**106h** 27:4,13
**106i** 28:2
**106j** 28:5,14
**107** 31:19,23 33:14 47:15
**11** 4:14 22:25 39:24 47:13 56:23 57:3,6 63:6 64:21 66:5 70:18
**11's** 10:23
**11s** 31:4
**12** 14:14 33:3 66:6
**120** 15:22 16:4,17
**122b** 33:19
**13** 22:21 66:9
**13s** 31:4
**14** 25:16 66:11
**14th** 35:9
**15** 49:10
**16** 32:6 46:18,22 68:1
**17** 8:21 24:11 52:17

| 5 |
|---|

**5** 22:25
**5,000** 8:12,25
**5,000,000** 51:19
**5.129** 22:4 36:18
**5.129.** 22:4
**51** 22:15,21 25:16 26:6 27:9 29:4 32:7 33:3
**51,500,000** 53:18
**515,000** 53:17

| 7 |
|---|

**7** 62:23 63:9 64:2
**7,000,000** 51:19
**7.7** 49:16
**71** 72:9
**715,000** 52:4 53:5 53:18
**7s** 31:4

| a |
|---|

**ability** 62:25 72:11
**able** 62:9
**accepted** 21:21,25
**access** 41:7,8
**accompanied** 2:13
**accompanying** 2:22
**account** 9:9 58:13 59:7,8,8,10,13,17 59:19 61:3 63:14
**accounting** 69:6
**accounts** 9:5 57:17 57:18,20,24 58:1,5 58:8,10 59:9 60:1 62:18 63:13,13
**accuracy** 4:11 67:7 67:23 68:4
**accurate** 7:20 8:9 25:24 33:14 65:18 65:22,24 66:14 68:6,15 69:22
**accurately** 57:13
**acres** 49:16
**action** 70:3 72:15 72:16
**actual** 12:20
**adam** 3:5
**add** 14:13 43:14 58:25 59:12

| 3 |
|---|

**30** 10:4
**30,000** 55:13
**31** 10:7 25:6,10

| 8 |
|---|

**80/20** 13:4
**85/15** 13:6

[address - bank] Page 74

address 4:3 22:25
27:3 37:4
adjourned 71:10
administration
62:16 63:22
admonition 69:5
advance 35:17
46:16
advanced 46:17
affairs 4:8 6:11,18
30:12 31:20 60:13
69:20
afternoon 6:6
44:11
agency 24:20
ago 6:14 12:18
16:13 24:2 48:6
50:15 55:20 56:16
68:24
agree 30:5 47:7
agreed 63:23
agreement 25:8
35:12 51:25 52:4
52:12,14,18 53:4
62:14
agricultural 20:4
ahead 7:23 44:4
aircraft 15:19
airplanes 15:2,9,11
airport 10:17 15:3
54:12
airstrip 15:14
alec 55:21
alfalfa 20:10
align 5:22
allie 22:25 23:13
amend 34:3,11,16
45:22
america 25:15 32:2
37:17 38:8

amount 13:4,7,12
16:16 20:5 45:8
51:14 52:3 58:4
63:18
amy 2:13 58:4 64:8
64:14
analyst 2:14
anderson 3:4 9:12
9:20,22 10:1,5,8,13
11:5 12:10,12
13:19 14:2,8,12,19
16:2,12,15 17:3,5,8
17:10,14,17,22,25
18:10,16 20:2,13
20:20 21:1,7,15,18
21:20,23,25 22:3,8
24:9,14,23 25:2,7
25:16 26:5,17 27:9
27:11,18 28:10
29:11,23 30:9,16
30:18,25 31:6,9,13
32:16,20,22,23
34:7,9,11 35:7,14
35:16,21,23 36:2,5
36:16,19 37:1,6,16
38:1,4,14 39:2,6,8
39:21 41:8,11
45:12,17,20 46:2
46:14,22 47:5,9
48:24 49:2,6,10,14
50:3 52:8,21 53:2
54:5,17 58:3,16,18
58:23 59:6,14,18
59:23 60:3,6,11,17
60:25 61:2,7,18,22
62:17 64:7 70:6,10
70:12,14
anderson's 41:4
answer 5:7,12,14
45:13 47:25 50:8
54:14 62:12

answers 31:23 33:2
anybody 43:24
46:4 50:22 54:21
56:19
anymore 18:4
64:20
anyway 62:24 63:3
apologize 67:22
71:2
appearing 2:17
appended 70:4
application 32:25
applies 45:17
apply 18:5
appointed 64:2
appreciate 71:7
appropriate 63:6
approval 11:23
14:21 21:24 22:1
51:7
approvals 51:3
approve 35:8 40:11
40:17 51:17
approved 32:25
36:7
april 24:13,15
arizona 2:20 3:1
6:17 61:20
arms 9:17
arrange 34:2
arrangement 52:24
artisan 56:5
arustic 31:7,9
asked 6:16 62:11
67:23
asking 5:10 8:4
54:10
asks 67:6
asset 18:25 19:2,10
assets 4:7 7:12,17
8:6 18:22,23 22:16

65:4,14,15,16,18
66:14 67:24 69:19
assistant 2:11
associated 63:21
assume 70:3
assuming 45:7
attention 11:9
attorney 4:18
29:14 32:16 40:8
40:10 42:12,24
68:20 72:13
attorneys 63:22
72:15
auction 55:19,25
audio 2:17 19:18
72:8,10
auditor 2:14
august 51:25 52:17
authorized 70:9
72:7
authorizing 70:3
auto 59:13,16
automatic 58:15
available 37:4
aviation 2:10 69:8
69:12,21 70:17
axos 58:9 59:8,19

b

b 35:4
back 13:1,3 18:22
29:12,13 56:10
61:21,24 64:1
bad 19:18
baker 6:16 9:13
58:20
balance 8:23 9:2,4
33:2 47:13
ballpark 51:18
bank 3:16 8:12,23
8:24 9:3 25:15 32:1
36:10 37:17 38:8

[bank - clear] Page 75

44:11,15,21 57:17
57:18,20,24,25
60:1,5,7,19 61:9
63:13,13
bankruptcies 11:1
bankruptcy 12:18
32:8 41:13 57:21
banks 58:7
barge 18:13,25
based 58:6
basic 56:25
basically 67:6 70:7
basis 4:21 36:7
53:6 53:13,16
56:24 57:13 58:15
bay 16:6,9 17:19
18:8 22:19 23:1,14
37:21 38:2,4 46:10
50:12
bedrooms 49:19,20
beginning 67:4
begins 25:15 68:1
behalf 3:16
belabor 65:1
believe 5:23 8:12
10:2 34:16 36:20
44:22,24 45:23
54:17 56:18 65:9
69:25 70:6
believes 45:10
ben 36:9
benefit 4:17
bernstein 3:4 32:12
best 7:21 25:24
27:24 28:12,17,20
33:15,16 34:19
41:11 43:21 55:24
65:18,25 66:15
68:16 69:23 72:10
better 63:1

beyond 37:14
big 59:20
billed 42:13
billon 35:4
bills 19:6 43:6
bit 4:2,21 8:3 32:14
34:21 46:9
black 14:23,24,25
15:8,13
blue 30:19
board 51:3
boat 55:19,25 56:5
56:10
boat's 56:7
bob 12:19,21,21
bodi 3:15 44:6,7
body 36:8
booth 16:6,9 17:19
18:8 22:18 23:1,14
37:21 38:2,4 46:10
50:12
border 55:1,3
bought 12:18 16:22
17:2 18:13 49:16
brenner 55:21
bring 70:24
bringing 11:8
bristol 16:4
brought 40:6
brunsworth 24:20
budgets 57:8
build 23:21 36:6
building 18:11
buildings 11:16
built 49:17
bunch 20:23 21:8
business 11:14
16:22 18:11,11
64:20
businesses 10:23

buy 13:11 20:16
48:1 49:7 60:24
buyer 20:1 55:23
buying 19:15

**c**

c 2:1 12:2
cabin 29:21 30:19
caldwell 3:15,15
44:2,5,6,9,13,18,24
45:5,16,19,25 46:3
54:6
call 14:3 41:15 52:7
candlelight 2:9
15:3 54:13 64:18
69:7,12,21 70:1,8
70:17,19
capital 3:10 20:21
20:22 46:9
card 5:20 6:1
carla 9:13,21
carried 47:13
case 2:7,10 4:5 7:18
7:19 31:1 36:22
37:10 39:24 40:22
45:2 57:3 61:23
62:23 63:5,11
64:19,20 65:2,10
65:16 69:21 70:6
cases 2:6 3:24
64:18,21,22,25
70:24
cash 61:8
cattle 2:9 4:3 19:4
19:6,7,7,13,15,25
20:4,11 27:7 62:7
65:2,16
cent 47:11
central 63:11
certain 13:3,7,12
40:24 57:7 63:18

certificate 72:1
certify 72:7,12
chance 13:10
change 34:16
changed 8:24 23:9
41:22 42:3
chapter 4:14 10:22
39:24 56:23 57:3,6
62:23 63:6,9 64:2
64:21 70:18
charge 55:17 63:7
63:10
charged 57:5,9
chase 8:24 57:24
58:13 59:8,12,17
check 9:25 11:25
25:20 33:23 47:2
51:4,14 58:13
checks 9:6,10 10:10
11:4
circle 2:9 20:4,14
20:19 21:12 27:7
36:21 37:11 64:18
65:2,4,16 67:12
69:5 70:8,19
circles 21:3
circular 21:5
circumstances 5:11
claim 5:21 22:18,22
22:24 23:3 26:22
40:9,11,17,23,25
43:10 45:2 53:17
claimed 36:21
claims 4:25 5:1
26:3 37:23 41:12
66:7
classified 45:1
clean 37:19,22
cleaning 38:21
clear 5:17 10:13
18:23 37:14

[clears - designed]          Page 76

**clears** 38:11
**client** 18:17,18,21
  49:14 61:11
**close** 38:20,23 55:6
  60:22 61:3
**closed** 16:12 57:21
  57:23 58:2 63:13
**closes** 35:17
**closing** 35:16 57:17
**coastal** 3:10,17
  26:17 46:9 50:25
**collection** 45:11
**come** 23:12 48:22
  53:20
**comes** 38:11 41:5
**coming** 2:16 51:10
**commenced** 31:25
**comment** 57:19
  63:2
**commercial** 15:22
  16:4,17
**communicate**
  63:17
**company** 2:9 16:18
  17:22 19:8 26:19
  65:4,16
**compete** 55:7
**competitions** 55:8
**complete** 7:20
  25:24 27:23 33:15
  65:18,24 66:14
  68:7,15 69:22
  72:10
**completed** 42:8
**completely** 57:12
**complex** 40:12
**comply** 63:12
**concerned** 52:11
  58:14
**concerning** 28:23

**concerns** 70:21
**conclusion** 70:24
**congra** 49:7
**connected** 72:15
**connecticut** 11:20
  12:4,23 15:14 32:2
  37:18 38:9,16,20
  38:22 39:1,10
  47:17,24 48:17
  49:2 54:12
**connection** 4:5
  13:22 19:18,18
  32:8
**consistently** 48:12
**consists** 23:14
**construction** 18:2
  18:14 42:15,17
**constructive** 4:21
**consultants** 3:18
**contained** 7:17
  33:14 69:19
**contingent** 44:25
  45:1,6 51:16
**continue** 56:20
**continued** 2:5
**contract** 42:17
**contracts** 16:20
  66:10
**contribute** 48:7,9
**convert** 62:23
**coordinate** 6:16
**copies** 9:11 47:2
**copy** 6:9 7:4 9:25
  28:24 29:8
**corporate** 64:21,24
**corporation** 11:11
  11:15 12:8
**correct** 2:21 7:10
  10:11 16:10 20:13
  27:2 28:3,7,13,16
  28:21 29:17 33:21

39:17 46:12 52:13
  52:19
**correctly** 13:16
**cory** 36:9
**cost** 14:6 21:10
**costs** 45:11
**cottage** 23:18,20
**counsel** 11:7 12:14
  34:2 35:25 36:3,3,9
  36:9,11 63:17
  70:23 72:13,15
**county** 12:3 23:1
  31:8,9,25 72:4
**couple** 31:24 44:14
  46:7 54:22 68:24
**course** 4:2
**court** 4:19 21:24
  22:1 32:2 40:9 57:8
  72:6
**courthouse** 41:6
**created** 14:25
**credit** 22:6 37:17
  52:7
**creditor** 26:14
  43:25
**creditors** 1:1 2:5,6
  2:8 4:15,25 17:11
  25:13 26:4 39:23
  57:2 63:8 69:4
  70:15
**crossland** 19:4,5,7
  19:7 20:19 27:7
**curious** 36:18
**current** 18:17
  64:12
**currently** 17:19
  19:12 20:18 32:4
  39:16 50:1,16
  58:22,23
**cut** 52:10

### d

**d** 2:1
**dale** 2:25
**date** 1:2 9:3 52:22
**dated** 44:22 72:18
**dates** 47:17,18
**david** 20:3
**day** 20:6 51:11
  57:20 72:18
**deal** 18:19 37:24
  38:10 43:21
**dealing** 5:6
**death** 40:6 41:21
**debt** 36:20,22,24
  38:7 45:13,21
  54:13
**debtor** 2:17 3:3
  4:13 5:1 10:24 57:6
  63:6 70:16,18
**debtors** 4:9,14
  27:16 29:6 66:11
**debts** 27:5
**december** 1:2 2:3
  16:12,24 24:11
  25:6,10 35:12
  44:22
**decided** 42:5
**decks** 38:11
**declaration** 28:23
  29:5 32:17,24 67:5
  69:11
**default** 18:21
**deliver** 30:22 33:10
  67:17 68:9
**demonstrate** 62:25
**depending** 38:24
**depends** 57:3
**deposition** 66:21
**describe** 49:15
**designed** 20:16

[designers - farms]                                                    Page 77

**designers** 3:17 26:17
**detail** 9:24 22:6 34:14
**details** 11:8 36:15 39:20 43:10 62:8 68:2
**developer** 12:3,22
**development** 12:24 13:9,22 14:6
**devoted** 4:12
**died** 42:2
**difference** 9:5
**difficult** 5:12 9:18 58:5
**difficulty** 67:9
**dip** 58:5,8,10
**direction** 14:17
**directly** 41:4 43:12 70:22
**disbursements** 59:25 60:4
**disbursing** 62:11
**disclose** 31:25
**disclosure** 12:7 28:2,6 32:7,16 34:12
**disclosures** 4:4 6:9
**discretion** 64:1
**discuss** 41:15
**discussed** 10:15
**dispute** 40:20 41:18,25 44:20,23 45:8 54:1,3,11
**disputed** 41:9
**disputing** 44:19
**dissolve** 18:6
**dissolved** 18:3
**docket** 70:5
**dockport** 56:5

**document** 7:1,7 41:2 47:15 67:8 69:10
**documentation** 42:23
**documents** 6:13 29:22 42:23 45:14 54:7
**dog** 14:23,24,25 15:8,13
**doing** 19:21 20:17 40:15 51:25 53:17 62:10
**downs** 53:6,11
**dr** 20:3,21 66:10
**drain** 14:14,15
**drawings** 40:6 41:19,20 42:2,7,15 42:15,16,17,25
**driven** 45:14
**driver's** 5:18
**due** 45:8
**duration** 57:3

**e**

**e** 2:1,1 34:25
**earlier** 46:8
**early** 24:9
**earned** 63:15
**easily** 62:12 70:2
**east** 23:1,14
**eastern** 2:4
**easy** 59:18
**effectively** 12:17 18:12
**eight** 34:7
**either** 20:19 22:6 27:20 37:23 70:22
**elaborate** 17:14
**elderly** 11:24 13:9 14:1

**electronic** 33:6 67:15 68:10
**electronically** 29:7
**elevation** 23:12
**email** 11:4 42:9
**embarrassing** 71:5
**embedded** 41:13 47:12
**empathy** 62:21
**employ** 63:18
**employee** 2:24 72:13,14
**enforcing** 57:10
**entirely** 18:23
**entities** 11:10 27:5 27:15
**entitled** 22:22 47:3
**entity** 10:25 11:12 11:13,25 12:20 13:20,21 54:13 63:9
**environmental** 23:23
**equally** 70:19
**equity** 38:22
**eric** 53:14
**essence** 13:11 14:5
**estate** 13:23,24 16:17,25 18:12 57:1 63:10
**estimate** 55:14
**estimated** 23:2
**europe** 55:22
**event** 4:1 23:9,10
**everybody's** 9:17
**exactly** 21:20
**examine** 4:16 43:25 50:23
**exceedingly** 58:5
**excess** 49:24

**exclude** 34:6,8
**excuse** 66:17
**executory** 66:9
**exempt** 22:17,23,24
**exemption** 23:2
**exercise** 64:1
**existed** 61:14
**exists** 18:5
**expect** 14:17 43:11
**expectancy** 55:4
**expecting** 14:20
**expedite** 63:24
**expeditiously** 64:17
**expense** 35:8,10
**expenses** 9:8 10:10 10:17,17,22 28:6 28:14 47:1 56:25 62:7
**explaining** 4:12
**explicitly** 34:8
**extent** 5:2 32:3,11 57:7 63:25

**f**

**facilitate** 30:6
**fact** 16:16 18:16,24 36:8
**factoring** 52:8,24
**failure** 23:11
**fair** 4:21 16:16 25:4 45:16 58:4 63:8
**fairfield** 11:19 12:3 47:17,24 48:17 49:15 50:8
**fairly** 12:22 35:8 36:6
**family** 49:21
**far** 8:10 25:22,22
**farm** 69:7
**farming** 20:6,8
**farms** 2:10 15:3 69:12,21

fashion 21:5
favor 13:5
feed 20:11
feel 41:14,16 70:21
feeling 5:7
fees 57:5,5
feet 49:18
figoni 10:19
figured 37:8
file 35:11 40:23
   41:6 42:24 56:23
   60:1 70:9
filed 40:9,25 59:21
   60:7 61:9
filing 35:7 61:14
   70:3
finalize 60:18
finally 19:3
financed 18:19
finances 63:7,19
financial 2:16 3:7
   4:4,8 6:9,11,18
   30:11,12 31:19
   32:1 51:22 52:1,18
   54:1,14 68:2 69:6
   69:20
financially 72:16
financing 37:22
   51:8
finding 67:9
fine 33:1
finished 42:16
firm 3:3 41:4
first 2:5,6 3:16
   22:24 24:15 36:10
   44:10,15,21 45:10
   65:15
five 6:14 21:14
flip 31:22
floor 39:23

florida 72:3,7
focus 3:25
focused 24:25
folks 3:11 43:4
follow 11:7 17:16
   22:13 39:20,24
   57:18 64:16
following 11:10
foot 39:19 55:14
foregoing 72:9
foremost 22:17
forever 63:20
forgot 2:23
form 9:2 22:16,22
   25:13 27:4,4 28:2,5
   28:22 31:19,23
   32:6 33:14,14,18
   47:15 66:2 67:25
formal 47:6
former 18:18
forms 25:23 34:17
forth 25:23
forward 7:12 9:23
   30:22 42:20
four 3:23 8:13 48:6
   49:20
fourth 7:1
fpr 1:3 72:21
free 41:14 70:21
frequently 24:5
friday 21:25
front 6:14,23 14:6
   23:5 25:18 26:7
   28:25 65:11 69:9
   70:1
fruition 38:11
fuel 14:23,24,25
   15:2,9,13
fuelling 15:2,11
full 23:16

fully 37:12 60:12
   61:12
funded 10:23 12:24
   59:10
funding 10:16,17
funds 46:13 57:6
   59:7
funneled 13:13
further 22:5 34:14
   41:15 56:20 72:12

g

g 2:1
gather 57:15
general 3:23
generally 16:20
gentleman 55:20
gentleman's 62:14
getting 31:16 51:7
   54:18 55:6 58:4
give 4:21 42:12,23
giving 60:15
go 7:23,23 8:4 17:3
   17:9 22:5 25:21
   29:21 34:13 35:5
   36:14 38:7,17 44:4
   47:5 56:10 59:1,14
   61:19,21,24 66:5
   67:3
goes 13:5,6 19:6
   31:9 58:13 59:17
going 3:22,23,24
   4:3 7:16,19 18:5
   22:12 24:22 26:24
   37:4,24 42:19
   51:15 56:20,21
   58:8 59:9 62:3,15
   64:20 65:2 66:20
   69:6
goldman 12:15
good 6:2 13:10
   25:21 30:23 36:13

39:22 44:12,13
   51:23 64:7,23
   70:25
goodrich 35:23
government 16:20
graves 53:14
great 27:3 40:14
   46:2 67:20 70:15
griffith 2:21,25,25
   3:2 33:11 61:16,19
   62:1 66:17,20,25
   67:2,19 68:9
groceries 60:24
   62:6
grows 20:10
growth 21:3,3
guarantee 44:20,21
   44:25 45:18,20,24
guaranteed 45:9,21
guarantors 27:20
gudreaux 2:13 58:4
guess 5:19 22:14
   32:24 38:25 39:22
   40:3 46:23 52:9
   70:2
guessed 71:4
guy 12:14 16:1
   19:14
guys 30:5 34:13
   70:11

h

h 34:25
half 56:10
hand 6:4
handled 53:14
hands 2:15
hang 19:17 59:4,6
happen 5:20
happened 12:23
   46:13,19

happening 10:12 30:25
happens 13:10
happy 64:8
harbor 16:6,9 17:19
hard 13:3 22:14 60:15 62:17
harmed 57:2
hay 20:10,11
head 19:14
headed 14:17 62:24
heading 63:3
health 5:19
hear 40:16,24 41:23 51:1
heard 10:9 35:9,12 55:20 64:9
hearing 10:20 14:19 43:17
heart 23:11
heated 23:18
hello 40:1
help 8:3 9:17 60:14 71:8
helpful 11:3 25:12 39:19
helps 67:11
hi 44:5 46:5
hire 60:12
history 68:2
hold 50:16,19 64:1
holding 16:17
holds 19:8
home 11:23 13:9 14:1 49:17
homestead 22:18
hope 35:17
hopefully 11:22
horse 54:23,25 55:1 55:3,7

hours 66:22
house 23:16,17 37:18,21 38:2,4,9 38:16,20,23 39:1 39:10 48:15 49:2 49:11,15
huge 12:3 14:14,15 21:7,8
hugely 24:24
humbling 71:5
husband 49:3

**i**

idea 21:9 51:14,18 61:23
identifying 22:23
imagine 10:15
impact 43:14
importance 57:14
important 3:25 43:5,10 57:8
impressed 25:2
improvement 20:22
inability 58:6
included 46:10
includes 8:5 56:23 56:25 68:1
including 45:11
inclusive 72:9
income 28:3 33:19 56:24 60:24 61:6,8 62:5
independent 63:9
indicate 44:19
indicated 45:6
indicates 8:11 12:7
indiscernible 5:25 19:8,16 24:21
individual 29:6 37:10

individually 15:12
informal 4:19
information 2:16 4:8,11,25 7:15,17 7:20 8:5 25:23 28:3 28:7,16 33:13,21 34:17 42:8 66:13 68:4,6,14 69:19
informed 29:15
initial 59:21,23
initially 52:6
ink 30:19 68:8
inquire 69:4 70:16 70:21
instance 37:16 38:1 61:8
insurance 5:20
insurances 64:6,12
intend 36:5 64:25
intended 23:8
intention 35:5
interest 39:10 53:5 53:22
interested 72:16
interesting 17:15
interim 62:9 63:19
interstate 3:16 36:10 44:11,15,21 45:10
investment 20:21
involved 4:6 12:15 15:16 32:4 53:12
involvement 12:19
irrigate 21:5
irrigation 20:25 21:1
issue 42:24 45:24 58:12 62:21 63:4 63:11
issues 43:15 57:16

item 9:24
items 8:16,17

**j**

j 2:7
january 35:16
jewish 11:23 13:9 13:25 14:1
joanne 24:19
joe 46:6
joint 14:3
jointly 48:24,25 49:3
joseph 3:13
judge 4:18 5:3 10:19
jumping 67:22
june 46:8,24 72:18

**k**

katherine 42:2
katherine's 40:5 41:21
keep 22:11 23:17 60:7 64:14
keeping 37:10
kind 15:1,10 16:21 18:10 19:6 20:15 30:25 54:25 55:7 58:21 62:22 63:20
kitchen 49:20
know 5:10,20 6:15 6:18,19 8:1,9 9:7 10:20 11:24 12:13 14:2,4 15:1,10,11 16:22 18:5,19 20:5 29:22 30:1 38:5 40:11,12 41:3,18 41:19,21,21,24 42:3 43:17,20,21 47:1,6,10,22,25 49:11,17 50:5 51:6

51:16 56:11 58:3
58:19,25 59:2,2
60:17 61:4,12,16
61:25 63:5 65:8
71:5
**knowledge** 7:21
25:27,24 28:12
28:18,21 33:15,16
34:19 65:19,25
66:15 68:16 69:23
**known** 12:22
**knows** 16:16 45:13
**kresswell** 3:5,7
51:21,24 52:3,9,16
52:23 53:3,9,15,20
53:25 54:10,19

**l**

**l** 35:4,4
**lack** 25:3
**land** 11:16 12:17
14:5
**large** 49:20
**larger** 53:6,10
**late** 58:7
**law** 3:3
**lawnsky** 3:14 37:20
38:7 46:6
**lawsuits** 31:24
**lawyer** 35:24
**lease** 19:16 20:4
21:11
**leave** 29:25 42:25
64:14
**lecturing** 64:24
**left** 38:8
**legal** 13:14
**legally** 14:4
**lending** 52:13
**liabilities** 4:7 7:12
7:18 8:7 27:21 37:5
37:15 65:5,24

67:24
**liability** 15:1,10
19:1 69:20
**license** 5:19 50:17
50:19
**life** 55:4
**lincoln** 23:1
**line** 5:4 37:17 42:22
52:7
**liquidation** 63:10
**list** 8:18 22:17
25:15 27:7,14,23
40:17,19 53:16
65:14,15,17 66:9
66:11 68:1
**listed** 24:4,18,19
26:9,13 33:24
40:20 50:1,4 56:1
**listing** 22:24 25:7
26:22 27:5,6 56:4
**lists** 66:10
**literally** 16:19,19
**litigation** 32:3
**little** 4:2 8:3 34:21
46:9 56:22
**live** 23:6,8 35:3
50:8 62:8 63:4
**lived** 48:12
**lives** 48:18
**living** 23:7 49:21
61:13
**llc** 2:10 14:23 15:5
15:22 17:19 18:2,4
18:6 19:4 65:4
**llcs** 4:9
**loan** 45:14 46:8,15
46:20 47:11 61:10
**local** 35:25 36:2,3,9
**located** 2:18
**location** 11:17 58:6

**locked** 37:11
**logistics** 5:6 63:21
**long** 4:20 56:7 62:8
63:18 66:20
**longer** 6:21
**look** 10:14 21:2
25:14 32:23 40:8,8
55:18 65:13
**looked** 42:1 68:15
**looking** 8:5,14,18
22:12,16 25:13
26:2 28:1 30:10,11
33:1,5,18 40:3
47:15 60:11 65:6
66:6 67:10
**looks** 8:9
**lost** 61:4
**lot** 7:25 9:7 10:19
12:13 17:10,11
18:24 28:18 29:20
36:23 48:20 51:9
62:17
**luck** 71:1

**m**

**madeline** 3:14 46:6
**main** 23:3 49:10
50:12
**maine** 2:12 23:1
24:20 31:25 48:15
48:19 50:16 56:6
**maintain** 55:24
**major** 4:1
**malcolm** 35:23
**manage** 57:1
**march** 24:12
**marine** 16:4 18:2
**mark** 41:9 63:16
**marriage** 49:5
**martin** 3:17
**martin's** 26:12

**marty** 40:2
**match** 6:1
**material** 67:4
**math** 53:18
**mcclinch** 1:1 2:7
4:4,16 5:5,8,14,18
5:20,23 6:3,7,13,21
6:24 7:2,5,8,10,13
7:19,22,25 8:2,8,11
8:15,16,20,22,25
9:6,19,21,24 10:4,6
10:11 11:3,9,12,15
11:19,22 12:2,6,11
14:1,11,13,20,24
15:5,7,15,18,21,23
15:25 16:4,7,10
17:2,20 18:3,9 19:5
19:13 20:3,10,25
22:12,20 23:5,7,11
23:16,23,25 24:2,4
24:8,13,17,19 25:5
25:10,18 26:1,7,10
26:13,16 27:8,10
27:13,16,19,22,24
28:4,8,11,15,17,20
29:2,5,14,17,19,25
30:4,13,15,23
31:16,21 32:5,10
32:13,19 33:5,9,12
33:16,20,22 34:1,4
34:15,19,25 35:2,4
39:2,3,4,9,12,15,17
39:23,25 40:2
41:18,24 42:5,21
43:2,13,20,25 44:3
44:5,12,17,23 45:3
46:5,12,25 47:19
47:21,25 48:2,3,5,8
48:11,14,18,21
49:1,4,9,16,20,24
50:2,10,14,18,20

50:23,24 51:6,12
51:15,19,21,23
52:2,6,15,20 53:1,8
53:12,19,24 54:1,4
54:16,20,24 55:1,5
55:9,12,17 56:2,5,9
56:13,16,18,22
57:22,24 58:2,25
59:12,16 63:2 64:4
64:13,19,23 65:6
65:11,20,22 66:1,4
66:8,12,16 67:9,13
67:18,21 68:10,13
68:17 69:4,9,13,15
69:17,24 71:2,9
**mcclinch's** 37:5,14
60:13
**mean** 9:25 17:14
24:23 30:18 38:9
43:4 46:23 47:5
50:7 51:10 52:21
54:6 61:11
**means** 25:8
**mechanisms** 10:16
10:22
**medical** 23:10
**medicare** 5:19,21
**medicine** 67:14
**meeting** 1:1 2:5,6,8
2:12 3:3,22 4:12
40:10 56:21 64:16
69:7
**meeting's** 71:10
**meetings** 70:8
**member** 70:9
**mention** 47:16
**michael** 12:15
**microphone** 19:20
44:8
**midwest** 21:2

**mika** 3:13 46:5
**mika's** 18:17
**million** 71:3
**mind** 60:7 63:11
67:16
**mindful** 36:23
70:20
**minimum** 57:2
**minus** 22:7 53:18
**minute** 29:3
**minutes** 2:4 6:14
66:24 67:1 68:24
**missed** 26:11
**modest** 36:6 37:7
**modestly** 59:10
**modify** 59:2
**moment** 19:17
67:14
**money** 13:1,3 17:9
17:10 20:15 27:15
32:7,11 37:19
58:11 61:14 62:4
62:10,11
**montana** 5:18 23:7
23:8 24:12 29:20
29:21,24,25 35:4
35:24 36:4,5,12
39:7,8 50:19 59:2
61:21,24
**month** 47:20
**monthly** 28:6 33:19
53:6,22 56:24
59:21 60:2 62:13
**months** 17:6 47:23
55:20
**moore** 3:17,17,19
3:21 26:12,18,20
26:23 27:2 39:25
40:1,3 41:1,6,16,23
42:4,7,22 43:3,7,8
43:18,23 44:1

64:22
**mor** 47:8,10
**moral** 2:3,11,22 3:2
3:9,11,19,22 5:9,16
6:2,8,20,25 7:3,6,9
7:11,14,23 8:1,3,10
8:14,18,21,23 9:1
10:3,9,12 11:2,7,13
11:18,21 12:1,5,7
13:15,21 14:7,10
14:16,22 15:4,6,13
15:17,20,22,24
16:6,8,11,14 17:4,6
17:9,13,16,18,24
18:1,7,15 19:3,11
19:17,23 20:8,18
21:6,13,17,19,21
21:24 22:2,5,11,21
23:6,10,13,22,24
24:1,3,6,16,18,22
24:25 25:4,9,12,20
26:2,9,11,15,18,21
26:24 27:3,10,12
27:14,17,20,23
28:1,5,9,14,16,19
28:22 29:4,9,14,18
30:2,5,10,14,17,20
31:3,7,11,14,18,22
32:6,11,15,18,21
32:23 33:8,10,13
33:18,21,24 34:2,5
34:8,10,12,20 35:1
35:3,5,13,15,19,22
35:25 36:4,13,17
36:25 37:3,13,24
38:3,13,25 39:4,7,9
39:13,16,18,22
40:19 41:3,10 43:7
43:9,24 44:4,7 46:4
46:19 48:1,4,6,9,12
48:16,22,25 49:15

49:19,22 50:1,5,22
54:21,25 55:3,7,10
55:13,16 56:1,3,7
56:12,15,17,19
57:23 58:1,15,17
58:22,24 59:4,21
59:25 60:4,10,15
60:21,23 61:1,5,15
62:2,21 63:4 64:5,8
64:12,14 65:7,13
65:21,23 66:2,5,9
66:13,19,23 67:1,3
67:11,16,19,22
68:12,14,18,22
69:1,3,10,14,16,18
69:25 70:7,11,13
70:15 71:7,10
**mortgage** 37:21
44:14 46:10 54:2,8
54:11,17
**motion** 35:7,11
36:7 62:23
**move** 7:11 35:14
42:19 64:17
**moving** 46:25

**n**

**n** 2:1 12:2 35:4
**nail** 57:15
**name** 2:10,23,25
12:1,15 16:1,3
26:12 27:3 34:22
34:24 36:8 44:6
46:5 48:23 50:24
61:17
**nancy** 27:8,10 39:2
39:4
**narrowing** 63:25
**necessary** 37:14
**need** 6:21 34:11,13
34:16 36:2,3 45:21
50:5 67:13

**needs** 37:24 40:10 43:16 60:23
**nelson** 3:4
**never** 18:23 23:21 31:1 41:20,24 42:1 55:20,23 71:3
**new** 30:25 57:18 63:13
**news** 64:23
**nine** 66:3
**non** 21:3
**northeast** 18:1
**norton** 3:9,10 50:24,25 51:9,13 51:18,20
**norton's** 61:11
**notary** 72:6
**note** 44:15 45:9 53:4,10
**notice** 35:6 40:23
**november** 46:18,22
**number** 2:7,10 5:21,22 12:18 16:23 55:18 59:16 69:22

**o**

**o** 2:1 12:2 35:4
**objections** 4:22
**obligations** 4:13
**obligors** 27:21
**obviously** 20:16 42:2 58:14
**occasions** 10:15
**occupied** 23:24 24:1
**occurring** 53:11
**october** 10:2,4,6 60:19
**offer** 14:17 21:19 21:22 34:21 42:10 55:23

**offering** 34:22
**offers** 24:7,16,17 25:3
**office** 2:16,19 3:1 6:17 30:20 57:9 58:20 59:1 61:20 70:22
**official** 22:16,21 28:2 33:18 47:15 67:25
**offline** 43:17
**offset** 21:9 22:7,8
**offsets** 20:22
**oil** 59:13
**okay** 2:3 5:9,16 6:2 6:20 7:2,11,13,21 7:22 8:2,8,16,18,21 9:1 14:16,22 15:4 15:17,21 16:14 17:4,13,17,18 19:23 22:5,11 25:4 25:9,20 26:2,7,18 26:21,23 27:3,12 27:19 28:9,11,12 28:22 29:14 30:15 30:23 31:14,21 32:21 33:5,9 34:10 34:14,20 35:13,25 36:13 37:13 38:13 39:4,9 43:2,15,23 44:16 45:5 46:25 48:6 50:5,21,22 53:15,25 54:7,10 54:19,21 55:10 58:17,24 60:10,21 61:15 62:1,16 63:1 64:4,18,22 65:11 66:4,12,23 67:2,11 67:13,14,16,21 68:12,13,18 69:2,3 69:9,13,17 70:7

**old** 11:23 16:21 23:19 55:2,3 63:12
**once** 4:10 62:18 64:15 65:3
**ones** 9:15
**open** 39:22 57:16 57:20 58:7 63:14
**opened** 58:5,10 59:19
**opening** 57:18
**operated** 16:18,23 17:23
**operates** 12:21
**operating** 9:15 17:22 18:4,11 19:8 20:15 59:22 60:2 62:13
**operations** 16:25 18:7 19:11
**opinion** 49:22
**opportunity** 4:15
**opposed** 37:10
**orchestrated** 70:11
**osceola** 72:4
**outlined** 70:17
**outside** 10:25
**owe** 27:5,15,15
**owned** 12:8 20:5 21:12 39:2 48:24 48:25 49:3
**owner** 11:12 16:5,8 19:5
**ownership** 39:10
**owns** 11:16 19:24 39:1 55:21

**p**

**p** 2:1
**p&s** 35:9
**package** 67:25
**page** 7:1,3,14,15 8:8,11,13 22:14,14

22:20,21 25:16 26:5,17 27:9 28:10 28:22 29:4 32:6 33:3 47:14 65:23 66:1,3,5,5,6,9,11 67:4,8 68:1,3,4,20 68:24 69:10
**pages** 22:12 26:4 69:1 72:9
**paid** 20:18 32:7,12 40:4,14,18 43:11 53:5,10
**paralegal** 31:17
**part** 4:11 21:15,17 22:23 24:25 33:2 47:15 61:13 62:18 67:4,25 70:4
**participate** 15:8
**particular** 4:17 14:9
**parties** 72:13,14
**partner** 11:24 12:5 13:14 14:24 15:6 51:4
**partner's** 12:1
**partners** 15:8,15 15:16,19
**partnership** 13:14 13:16,17,22 15:4
**parts** 3:23
**party** 18:22 56:3
**pass** 48:23
**patience** 63:18
**pause** 9:1
**pay** 5:1 38:6 43:6 53:6,10 59:13 62:6
**paying** 13:12
**payment** 57:4
**payments** 18:20 20:23 53:22

payroll 19:6
pays 20:5 36:19,22
  59:16
pen 30:24 31:16
  68:8
penalty 67:5 69:11
pending 32:2,24
  68:5
penny 63:14
people 48:20 55:18
percent 12:8
period 21:11 40:24
  59:23 60:8
perjury 67:5 69:11
person 2:15 19:24
personal 8:6,6,17
  8:19 37:5,15 44:20
  44:21,25
personally 45:9
  49:13
pertain 7:18 69:21
  70:18
pertaining 69:11
pertains 68:2
petition 4:6 6:10,16
  6:22 9:3 17:7 25:7
  47:10,11 57:17
  60:4 65:8 70:4,4
petitions 6:19
phase 42:14
phases 42:14
phoenix 2:19 3:1
  23:12
phonetic 2:13 3:6,7
  3:14,15,16 10:19
  18:17 23:1,14
  24:20 31:7,9 35:23
  36:8,9 37:20 38:7
  44:2,5,6,7,9,13,18
  44:24 45:5,16,19
  45:25 46:3,7 49:7

51:21,24 52:3,9,16
  52:23 53:3,9,14,15
  53:20,25 54:6,10
  54:19 55:21 58:4,9
  59:8,19 60:12
physically 2:18
  58:6
picks 44:8
piece 12:16
pier 18:14
piers 18:11
pivots 20:24 21:4,8
  21:10,11 22:10
place 9:9 20:8
  28:24 62:20
places 36:24
plane 21:2
planning 51:3
plans 42:9
please 6:4 26:3
  30:3 33:8,10 68:8
  68:12 69:16 70:21
plus 53:6
point 16:15 40:4
  43:21 46:16 64:3
portion 41:20,25
portland 2:12
  31:12
posed 5:3
position 54:2,11
possession 4:13
  42:11 63:7
possible 6:22 70:25
post 60:4
posted 64:15
pre 25:7 47:10,11
  57:17
precise 4:24
preferably 47:23
preliminary 42:15
  42:16

preparation 32:9
prepared 5:14 40:7
prescott 3:5 34:6
  60:18,22
present 58:7
president 53:13
pretty 13:10 35:6
  35:14 38:20,23
  40:12 58:14
previously 47:16
price 22:2,9 34:22
  38:5 48:7,10 56:22
primarily 37:18
primary 18:25
principal 4:14
prior 17:6 49:4
  52:13
probably 15:7
  25:21 29:20 30:19
  40:22 43:10,15,21
  49:9,12 50:14 55:1
  55:5,6 61:10
problem 42:13 61:2
proceed 6:3 64:21
  65:1 69:7
proceeding 4:20
  6:6 35:10
proceedings 1:1
proceeds 10:24
  13:2 14:9 46:20
  61:10
process 19:15
  20:17 30:2,6 41:13
  41:14 47:6 58:21
  59:3
produce 47:6,7
produced 5:18 9:6
  9:13 55:23
produces 20:11
program 57:7

progress 62:3
project 13:11 40:5
  42:1,6,19 51:16
  53:13
projects 40:15
prolong 6:20
promissory 44:15
  45:9 53:4
pronounce 58:9
pronunciation
  58:10
proof 40:9,23,25
properties 37:25
property 8:19
  12:25,25 16:5,9,11
  19:9 21:8 22:17,22
  22:23,25 23:14,19
  38:18 46:11 48:1
  48:17 50:3,12,13
  51:2
proposed 21:19
proposes 5:1
prospective 4:2
  20:1
protect 14:25
protecting 19:9
provide 4:24 45:14
  47:17,18 54:7,7
provided 38:5 72:8
public 72:6
pull 5:24
purchase 21:17
  22:9 34:21 48:7,10
  49:4
purchased 20:14
purchaser 34:23
purpose 13:24 62:7
put 6:14 13:1 14:5
  20:21,23 21:7
  60:20

[putting - robin]                                                              Page 84

| | | | |
|---|---|---|---|
| **putting** 9:15 | **really** 20:14 36:21 | 15:24 17:18,21 | **responsibility** 57:1 |
| | 38:8,13 40:13 | 18:1 19:4 52:8 | 57:9 |
| **q** | 43:14 46:15 53:12 | **relative** 4:25 72:12 | **rest** 40:11 43:16 |
| **quarter** 24:15 | 56:11 62:4 | 72:14 | **rests** 36:24 |
| **quarterly** 57:5 | **realty** 3:10 15:22 | **relatively** 4:19 | **results** 62:22 |
| **question** 8:21 | 46:9 50:25 | **remediation** 12:24 | **retain** 9:16 |
| 25:22 32:6 34:15 | **reason** 4:24 34:16 | **remember** 16:3 | **retained** 24:22 25:5 |
| 41:5 45:4,13 46:19 | 42:19 53:16 | 24:10 65:10 | 25:10 |
| 51:1,13 52:15 | **reasons** 38:17 | **remind** 4:16 | **retention** 36:6 |
| 57:19 62:12,12 | **recall** 7:6 40:20 | **rent** 9:9 20:18,23 | **retrieve** 29:22 |
| 65:15 66:17 68:5 | 51:24 52:5 53:7,11 | 21:9 | **returned** 29:16 |
| 69:18 | **receive** 11:23 | **rented** 18:13 | **review** 2:15 42:1 |
| **questions** 4:23 5:2 | **received** 24:16 | **reoccurring** 59:15 | 47:3 |
| 5:7,11,12,15 22:13 | 29:13 60:19 | **repeat** 52:15 64:24 | **reviewed** 41:20 |
| 22:15 26:25 31:23 | **recommended** | **report** 59:22 60:2 | **reviewing** 28:11 |
| 33:2 39:24 44:2,14 | 36:11 | **reporter** 72:6 | 65:20 |
| 46:1,7 54:23 56:20 | **record** 5:17 35:6 | **reports** 9:15 62:13 | **rid** 54:18 |
| 64:16 70:20 | 40:15 45:12 65:17 | **represent** 44:6,10 | **right** 2:18,20 3:20 |
| **quick** 46:7 50:25 | 72:10 | 46:6 50:25 51:22 | 5:9 6:4,24 7:11 9:1 |
| **quickly** 35:14 65:3 | **recording** 2:17 | **represented** 3:3 | 10:3 11:2,21 14:2 |
| **quite** 32:14 37:8 | **recreate** 62:10 | 4:18 35:20 | 14:17 17:5,8 18:15 |
| 38:23 45:3 58:19 | 63:19 | **representing** 3:6,9 | 19:23 22:7 23:20 |
| | **refer** 26:3 57:4 | 3:13,19 | 23:22 26:18 28:19 |
| **r** | 67:24 | **requesting** 64:2 | 29:9,9,23 30:18 |
| **r** 2:1 | **reference** 23:3 | **requirement** 56:23 | 31:22 34:12,24 |
| **r.d.** 12:19,20 13:19 | **referring** 13:7,16 | **requirements** | 35:15,19 36:13,14 |
| **raise** 6:3 | 62:13 | 63:12 | 36:25 37:19 38:1,5 |
| **ranch** 4:3 9:8 10:16 | **reflected** 34:17 | **reservation** 54:5,15 | 38:15 39:11,18 |
| 19:10,12,15,25 | **refuel** 15:9,19 | **reserved** 45:24 | 42:4,21 43:7 45:15 |
| 20:1,7,15,21 21:10 | **refurbish** 16:20 | **resided** 47:16,24 | 46:11 47:14 48:21 |
| 34:21 36:20,23 | **regularly** 62:3 | 50:12 | 48:22 49:12 51:5 |
| 47:1 54:2,8 62:7 | **regulations** 23:23 | **residence** 22:18 | 52:9,22,25 53:19 |
| 68:3 | **reimbursement** | **resides** 39:5,14 | 54:23 56:19 60:5 |
| **ranch's** 10:10 | 35:8,10 | **residual** 22:9 58:12 | 60:24 61:1,2,6,9 |
| **randy** 3:5 16:16 | **relate** 52:24 | **resolution** 52:12,24 | 63:15 64:5 65:6,13 |
| **reach** 15:11 | **related** 18:7 | **resolve** 43:22 | 65:20 70:10,13,14 |
| **read** 22:14 | **relating** 22:15 | **resolved** 70:23 71:6 | **rights** 45:24 |
| **ready** 5:7 | 44:14 | **resolving** 43:9 | **road** 22:25 23:14 |
| **reaffirm** 57:10,14 | **relation** 54:6 | **resources** 14:14 | **robert** 12:2 |
| **real** 13:23,24 16:8 | **relationship** 10:18 | **respect** 57:16 69:5 | **robin** 1:3 72:6,21 |
| 16:17,25 18:12 | 11:10,11 14:23 | 69:25 70:8,16 | |
| 19:9 | | | |

rookies 55:5
room 2:12 44:10
  49:21,21 66:22
round 23:17
rubbing 19:19
rules 70:17
running 23:18
rush 30:1

**s**

s 2:1 12:2 29:10
  34:25
sailboat 55:11
sailing 40:15
sale 4:2 13:2,23
  14:8 18:22 21:15
  24:5 35:6,11 36:6
  38:2,16,18 50:1,4
  56:1
sam 3:4 9:10,19
  11:3 14:11 15:25
  32:19 36:17 43:21
  47:3 52:20 54:14
  54:16 58:25 61:16
  61:16 70:2
satisfactory 70:24
sawyer 3:4
saying 13:23 49:10
  66:23
says 9:2 45:20,20
  54:8
scan 7:15
schedule 7:17 45:7
  54:23 55:10
schedules 6:10,12
  6:17 26:15 28:24
  40:20 44:19 45:22
  53:16 65:4 66:14
  67:7
schooners 16:21
scinto 12:2,19,20
  12:20,21,21,23,25

13:10,18,19 14:5
  26:9
season 23:20
second 46:15
secret 38:10
section 33:22
secured 18:22
  36:20,22 37:18,23
  38:9
secures 54:13
security 5:22 25:14
  33:23 34:6 58:13
  59:1,5,20 60:23
  61:4,13,20 62:5,16
  63:22
see 7:4 21:3 22:19
  23:4 26:9,12,15
  31:3,24 32:9 36:7
  39:20 41:1
seeing 40:20
seen 26:21
sell 20:16 38:19,19
  38:24 55:17
seller 18:16,18
  36:11 37:21 49:11
sells 13:3 15:13
  38:5
send 9:21,22 34:3
  42:10
sense 13:14 31:13
  40:22
sent 29:12 42:9
separate 18:10
  65:7
september 7:9
serious 5:6
services 3:8 32:1
  51:22 52:1,18 54:1
  54:14
set 25:23 42:9,11
  62:18,19

settlement 51:25
  52:4,12,14,18 53:4
seven 2:4 15:7,18
shawn 6:16 9:13
  58:19
shawn's 62:18
shipyard 16:5,18
  16:19 17:19,23,24
  18:8 19:1 24:11
  52:13,25 53:13
  55:21
short 63:16
show 60:5,6,9
shown 24:5
shows 32:13 55:8
shuett 20:3,21 35:1
  35:3,19 66:10
shur 3:4 32:12
side 36:12 53:13
sign 29:24 30:13,21
  33:7 34:3 67:17
  68:12,23,25 69:15
signature 7:4,4,5,6
  28:25,25 33:6
  67:15 68:3,7,11
  69:1,14 72:21
signatures 68:21
  68:22
signed 29:3,8,12,15
  31:15 33:3 34:13
  42:8 67:7 68:8
significant 40:21
  43:14
significantly 9:4
signing 7:7
signor 67:6
simply 42:18 64:25
sir 3:21 5:16 43:8
sit 44:8
sits 10:25

sitting 18:25 30:20
situation 71:4
six 15:7,18
sixth 7:1,3
slash 29:10,10
small 43:4
smart 3:13,13 46:5
  46:6,13,21,23 47:8
  47:14,20,22 48:20
  49:13 50:7,11,16
  50:19,21
social 5:21 33:23
  34:6 58:12 59:1,4
  59:20 60:23 61:4
  61:13,19 62:5,15
  63:22
sold 12:25 15:25
  16:7,11,24,25 17:4
  17:20 24:10
sole 70:9
solely 14:25 15:2
solemnly 6:4
somebody's 19:19
soon 35:6 36:15
  62:15 70:25
sooner 62:25
sorry 2:23 19:24
  41:23 48:8 52:10
  52:16 63:2
sort 3:23 4:1 39:19
  50:8
sound 5:3
sounds 14:16 52:22
source 61:5,7
southern 12:22
space 18:13
speaker 5:25 6:12
  6:15 19:21 22:7
  29:7 30:7 55:15
  64:9,11 68:19,23
  69:2

[speaking - title]                                                                    Page 86

speaking 14:4
specific 52:22
specifically 20:23
    44:18
specifications 40:7
specifics 37:1
speech 56:22
speed 60:13
spell 34:24
spelled 34:24
spend 9:16
spending 48:19
spent 10:18 47:11
    63:15
spinglass 60:12
split 13:4 14:8
spring 53:21
sprinklers 21:6,7,8
square 49:18
stand 43:18 64:5,25
start 4:23 5:10 6:8
    29:19 46:23 62:20
started 34:20 42:18
starting 26:5
state 72:3,7
statement 4:8 6:10
    6:18 7:12 30:11,12
    31:19 33:19 56:24
    60:19 69:19,20
statements 4:7 60:1
    60:5,7
states 2:11 30:21
    57:7
statute 23:4
steve 2:11 6:16
stockman 8:12,24
    9:2 57:25 59:7
stop 46:14
stopped 40:5 53:22
stray 4:23

street 10:18,24
    11:11,15,16,18
    12:8,14,16,17 13:5
    13:17 15:22 16:5
    16:17 27:7 38:10
    38:21 49:7 51:2
    59:11,11
string 56:11
strong 55:23
stub 59:23 60:8
stuff 16:21 60:14
    62:22
subject 21:24,25
    51:6,6,7,9 54:18
subpart 34:7
suggest 51:10
suggested 55:19
summary 65:14
summer 61:11
super 17:15
superior 32:2
supervising 2:14
supporting 47:1
supports 23:4
sure 5:17 8:14 9:22
    17:15 22:11 26:25
    30:14,17,21 34:23
    43:13 44:4,9,17
    45:5 48:20 52:16
    59:3 66:19 67:18
surplus 37:3,6,9,13
survey 56:14,15
surveyed 56:12
swear 6:4
switch 59:18
switched 59:15

t
t 12:2 34:25,25
take 4:22 8:1 10:14
    13:11 41:17 62:20
    66:20 67:13,14

takes 20:8
talk 34:20 36:17
talked 25:21 38:25
talking 36:14 48:14
    48:16 62:4 68:19
tate 24:19
teleconference 2:18
tell 6:4 11:9 13:15
    14:22 22:3 23:13
telling 19:24
tells 29:15 32:23
ten 17:6 21:11,14
    22:15 66:5
term 21:14
terminate 56:21
    64:16 69:6
terms 15:11 62:10
terrance 2:6 64:19
terry 1:1 12:17
    13:5,7 14:5 16:22
    17:12 24:9 25:17
    26:5 27:9 28:10
    39:3 40:1 41:16,17
    43:18 44:1 58:20
thank 3:2 5:16 6:8
    11:8 14:10 15:20
    25:12 27:4 28:1
    33:1,13 34:5 44:1
    46:3 51:20 54:19
    65:21 67:3 71:1,9
thanks 19:23 30:5
    30:10 54:21 56:19
    64:22 67:2 69:3
    71:10
thing 8:15 38:15
    40:3 41:3,12 43:4,4
    55:24 57:14 63:20
things 16:21 18:14
    30:25 38:24 41:15
    43:12 51:10 53:11
    57:12 66:11 70:23

think 5:3,23 6:25
    7:11 10:1,9 11:5
    18:4,21 19:21
    20:14 21:4 24:14
    24:23 25:16 29:12
    30:18 32:19,20,22
    34:9 36:19 37:7,7,9
    38:6,14,20,23
    39:18 40:10 41:3
    41:19 43:9,15,20
    45:7 48:3,5 49:6,17
    51:2 57:11 58:13
    61:24 63:5 64:7
    65:8 67:14
third 4:11
thorp 10:18,24
    11:11,15,16,18
    12:8,13,16,17 13:5
    13:17 27:6 38:10
    38:21 51:2 59:11
    59:11
thought 24:11
    26:13 37:11 49:8
    55:22
three 2:6 8:11
    23:20 47:23 48:6
    50:9 56:16 58:8
thursday 11:22
    14:18,21 51:4
tim 3:9 50:24
time 2:4 8:1 10:19
    17:21 25:21 31:5
    39:22 40:7,24
    46:16 48:19 50:11
    53:21 60:16 61:14
    65:14
timely 56:24 57:4
    57:13
timing 58:17,18
title 48:23

**today** 3:20 5:13 9:4 42:10,11,25 45:10 65:9
**told** 57:11
**top** 25:17 28:10
**tpl** 3:7 32:1 51:22 52:1,18 53:16 54:1 54:13
**track** 40:14
**transaction** 17:1 21:16
**transcribe** 72:8
**transcribed** 1:3
**transcriptionist** 72:1
**transfer** 37:9 58:18
**transferred** 9:8 58:11
**transferring** 59:7
**transfers** 59:10
**transition** 62:19
**tried** 63:16
**truck** 15:9
**trudeau** 1:3 72:6 72:21
**true** 7:20 12:10,11 25:23 33:14 65:18 65:24 66:14 68:6 68:15 69:22 72:10
**trustee** 2:12 30:21 57:7 63:9 64:2
**trustee's** 2:19 3:1
**trustees** 31:11
**truth** 4:10 6:5,5,6
**try** 3:25 13:8 43:22 64:17 65:2
**trying** 9:16 40:12 52:10 64:3
**turn** 6:25 21:4 65:23

**two** 4:9,14 8:8 10:23 13:21 57:24 59:9 66:22 67:5,8 69:10
**type** 20:8

**u**
**u** 34:25
**u.s.** 2:19 3:1
**ultimate** 13:23
**ultimately** 18:21 38:17
**understand** 4:1 5:5 13:15 14:7 40:13 45:3 63:20
**understanding** 3:24 20:20 62:2
**underway** 30:3 58:22,23
**undisputed** 40:21
**unfortunately** 18:19 49:13
**unidentified** 5:25 6:12,15 19:21 22:7 29:7 30:7 55:15 64:9,11 68:19,23 69:2
**united** 2:11 30:21 57:6
**unoccupied** 24:3
**unsecured** 26:3,4 26:14 36:21 66:7
**use** 15:8 18:14 30:23 36:11
**uses** 62:5
**ust's** 6:17

**v**
**value** 22:9 23:2 49:23 55:16 56:17
**various** 4:4 6:13

**venture** 14:4
**venturers** 14:3
**verification** 4:10
**verify** 5:25
**vet** 4:2
**video** 2:17 31:2,3 31:10
**view** 39:19
**voluntary** 4:6 6:22
**vouch** 67:6
**vouching** 68:3

**w**
**wait** 29:3 31:18
**waiting** 31:14
**waldo** 31:25
**walk** 42:25
**want** 3:11 4:1,16 6:20 10:20 14:13 15:10 37:2 42:25 43:3 44:7 47:5,21 47:22 57:13,15 61:3 62:9 67:24 70:21 71:5
**wanted** 26:25 29:23 57:10
**wants** 22:6 39:20
**water** 23:18,21 56:8,10
**waterfall** 13:2,13
**way** 14:9 19:9 20:24 21:21 37:25 44:20 45:13 61:21
**we've** 9:16 25:21 30:7 34:22 58:3 60:7
**week** 58:7
**weigh** 3:11 12:12
**went** 17:10,11,11 17:12 24:12 34:18
**wife** 27:10 39:13 48:7,9 49:3

**wife's** 48:23
**window** 63:24
**winter** 20:12 23:17
**wish** 32:13 43:25 70:25
**wishes** 40:8
**wood** 55:15
**words** 62:9
**work** 4:20 16:20 41:4,25 43:12,16 62:17
**worked** 58:3
**working** 30:7 58:20 60:18
**works** 56:5 58:19 61:23
**worth** 18:24
**wrap** 34:14
**writing** 11:24 51:4
**written** 9:7 47:3
**wrong** 20:13 22:4 32:22 58:9

**y**
**yeah** 8:11 10:8 12:12 13:19,20 14:12,20 15:5 16:2 17:2,25 20:3 21:18 22:4,8,11 24:15 25:18 26:9,23 27:14,17,18 28:17 29:5 31:11 33:24 35:15 36:5,16 38:3 39:21 42:22 45:19 49:1,9 51:9,12 52:21,22 58:1,16 58:23 60:9,10 61:15,18 62:20 67:13
**year** 16:13,24 21:11,14 23:16 24:2,3,10 25:11

**[year - zoning]**

32:8,12 46:8 47:19
47:21 50:15 53:21
56:9
**years**   12:18 14:14
16:23 21:13 23:19
47:22,23 48:6 50:9
55:2,6 56:16 71:3
**yelling**   44:10

**z**

**zoned**   13:8
**zoning**   14:19,20
23:22

## FLORIDA RULES OF CIVIL PROCEDURE

### Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).




DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.